Argued July 14, reversed and remanded December 23, 1970,
petition for rehearing denied February 23, 1971

STATE FORESTER et al, *Appellants and Cross-Respondents, v.* UMPQUA RIVER NAVIGATION COMPANY, *Respondent and Cross-Appellant.*

478 P2d 631

*John W. Osburn,* Assistant Attorney General, Salem, argued the cause for appellants and cross-

respondents. With him on the briefs were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Thomas C. Stacer, Assistant Attorney General, Salem, and Geddes, Felker, Walton & Richmond, Roseburg.

*Bruce Spaulding*, Portland, argued the cause for respondent and cross-appellant. With him on the brief were Mautz, Souther, Spaulding, Kinsey & Williamson and Manley B. Strayer, Portland.

Before O'CONNELL, Chief Justice, and SLOAN,[*] DENECKE, HOLMAN, HOWELL, SCHWAB and LANGTRY, Justices.

DENECKE, J.

The plaintiffs are the State Forester and a governmental subdivision created for fire fighting purposes. Plaintiffs brought this statutory proceeding to recover the fire suppression costs incurred in fighting a large forest fire known as the Oxbow fire. Plaintiffs allege that the fire was started by the negligence of the defendant. A jury returned a verdict for defendant and plaintiffs appeal.

On August 20 the defendant, Umpqua River Navigation Company, was working on a federal contract to resurface a forest road. Umpqua spread gravel and then compacted it by running a roller over it. On that date, at a place near where the roller was operating, several fires broke out which allegedly originated the Oxbow fire. On August 21 an investigator for the State Forester observed Umpqua's road roller parked on the forest road near the area where the fire alleg-

---

[*] Sloan, J., resigned September 30, 1970.

edly started. The investigator suspected that the fire
might have been caused by the roller emitting sparks.
During the next few days while the fire was still
going, he brought several mechanics and others to
examine the roller. These persons took off the exhaust
stack to look for carbon and removed carbon speci-
mens for laboratory testing. They also took off the
air cleaner for inspection and operated the roller in
a limited area. All this was without the knowledge
or consent of Umpqua.

The plaintiffs subsequently commenced this action
against Umpqua alleging, among other things, that
it was negligent in operating a roller which threw
sparks and caused the fire. The defendant filed an
equitable answer alleging that because of plaintiffs'
inspection and operation the roller was altered and
Umpqua was prevented from subsequently conducting
relevant tests to demonstrate its freedom from neg-
ligence. Defendant asked that any evidence plaintiffs
obtained from these inspections and tests should,
therefore, be suppressed and plaintiffs should be en-
joined from proceeding with this litigation against
defendant. Defendant also filed a motion to suppress
all evidence obtained as a result of plaintiffs' inspec-
tion and testing of the roller. After an evidentiary
hearing in equity, the trial court held the equitable
defense had not been made out; however, the motion
to suppress was granted and plaintiffs assign this as
error.

The motion to suppress did not specify any par-
ticular legal basis. The trial court memorandum and
the briefs on appeal, however, are clear that the de-
fendant before the trial court and on appeal based its
contention on constitutional grounds. Defendant con-

tends that the fourth amendment to the United States Constitution and Art I, § 9, of the Oregon Constitution, prohibiting unreasonable search and seizure, have been violated. The defendant further contends that under the principle of *Mapp v. Ohio*, 367 US 643, 81 S Ct 1684, 6 L Ed2d 1081, 84 ALR2d 933 (1961), and the Oregon law preceding *Mapp v. Ohio*, for example, see *State v. McDaniel*, 115 Or 187, 209, 231 P 965, 237 P 373 (1925), evidence discovered or seized in violation of the constitutional prohibition against unreasonable search and seizure is inadmissible. Defendant contends that this principle rendering the evidence inadmissible is as applicable in a civil proceeding in which the state is seeking to introduce the evidence as it is in a criminal proceeding. The trial court suppressed the evidence upon the ground that the search was unconstitutional.

Umpqua contends the search and seizure was unconstitutional because it was accomplished by trespasses upon Umpqua's personal property and by violation of criminal statutes prohibiting entry on or injury to motor vehicles. ORS 164.650, 164.660 and 164.670.

The plaintiffs argued that whatever search and seizure occurred, it was not in violation of the federal and state constitutions, and, furthermore, admitting for the purpose of argument that it was in violation, the evidence obtained thereby should not be excluded because this is a civil proceeding, not a criminal case. This latter issue is the basis for our decision. We do not intend thereby to infer that an illegal search and seizure was made. If an enclave of privacy is what is protected by the Fourth Amendment, we have doubt whether any enclave of privacy was penetrated in this case.

The exclusionary rule, where it is applicable, is now required by the federal constitution. *Mapp v. Ohio,* supra (367 US 643). Our analysis of the decisions of the United States Supreme Court leads us to the same conclusion as that of the Second Circuit. "Widespread uncertainty is prevalent on the issue of whether evidence, inadmissible in a criminal case, can be used for other purposes, and the Supreme Court has yet to resolve the problem." *Pizzarello v. United States,* 408 F2d 579, 585 (2d Cir 1969). *Mapp* itself gives no express clue. It was a criminal case.

The closest in point is *One Plymouth Sedan v. Pennsylvania,* 380 US 693, 85 S Ct 1246, 14 L Ed2d 170 (1965). In that case state law enforcement officers on the suspicion that the occupants of a car were violating the state liquor laws, stopped a car. They searched the car and found untaxed liquor. The car and the liquor were seized and the state started a statutory proceeding to forfeit the car. In that proceeding the trial court found the forfeiture could be sustained only upon the basis of evidence that was obtained in violation of the federal constitutional provision barring illegal search and seizure. The forfeiture was, therefore, dismissed. The Pennsylvania Superior and Supreme Courts both held contrary to the trial court upon the ground that the forfeiture proceeding was a civil proceeding and the exclusionary rule was only applicable in criminal prosecutions. *Com. v. One 1958 Ply. Sdn. (McGonigle),* 199 Pa Super 428, 186 A2d 52 (1962), 414 Pa 540, 201 A2d 427 (1964). The United States Supreme Court held the exclusionary rule was applicable to the forfeiture proceeding. The primary reason for the holding was "a forfeiture proceeding is quasi-criminal in character. Its object, like a crimi-

nal proceeding, is to penalize for the commission of an offense against the law." 380 US at 700.

The court relied upon *Boyd v. United States*, 116 US 616, 6 S Ct 524, 29 L Ed 746 (1885). In that case the United States Attorney filed a forfeiture proceeding against items seized for failure to pay custom duties. An act of Congress provided that the government could secure an order of the court requiring the importer of the merchandise to bring into court the invoice for the merchandise. The Court held the statute unconstitutional because it authorized an unconstitutional search and seizure. The Court in *Boyd* stated:

"* * * We are also clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they [the proceedings] may be civil in form, are in their nature criminal. * * *. The information, though technically a civil proceeding, is in substance and effect a criminal one. * * *. As, therefore, suits for penalties and forfeitures, incurred by the commission of offences against the law, are of this quasi criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution * * *." 116 US at 634.

The present case does not have any criminal character. The proceeding is to recover actual costs and nothing more.

Umpqua strongly urges that *Camara v. Municipal Court*, 387 US 523, 87 S Ct 1727, 18 L Ed2d 930 (1967), and *See v. City of Seattle*, 387 US 541, 87 S Ct 1737, 18 L Ed2d 943 (1967), are dispositive. In both, the Court held that under the Fourth Amendment a person

could not be convicted for refusing to allow an administrative inspection without a warrant. *Camara* involved an inspection to determine whether the building code was violated and in *See* there was a fire safety inspection. These decisions do extend the Fourth Amendment beyond its previous application only to law enforcement officers. They do not, however, pass upon the question of whether or not evidence secured in an administrative search without a warrant and, therefore, in violation of the Fourth Amendment, will be excluded from evidence in a subsequent civil action.

The decisions of some federal and state courts hold that evidence seized in violation of the Fourth Amendment is inadmissible in a civil case. The trial court in the instant case relied heavily upon a recent federal trial court decision, a treble damage anti-trust case, excluding illegally seized evidence.

*Rogers v. United States*, 97 F2d 691 (1st Cir 1938), was a civil action for custom duties and the court held illegally obtained evidence inadmissible. The court relied upon a statement of Mr. Justice Holmes in *Silverthorne Lumber Co. v. United States*, 251 US 385, 40 S Ct 182, 64 L Ed 319, 24 ALR 1426 (1920) : " '[T]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely the evidence so acquired shall not be used before the court, but that it shall not be used at all.' " 97 F2d 692.

*Pizzarello v. United States*, 408 F2d 579 (2d Cir 1969), is a proceeding to collect unpaid wagering taxes. The evidence held illegally obtained was secured by law enforcement officers when Pizzarello was arrested for gambling. The government tried unsuccessfully to prosecute the defendant criminally and to enforce a forfeiture on the gambling funds seized. In this tax

collection proceeding the court held the evidence inadmissible, stating:

"* * * Absent an exclusionary rule, the Government would be free to undertake unreasonable searches and seizures in all civil cases without the possibility of unfavorable consequences. In such a situation, while the matter has not been settled by Supreme Court decision, it seems clear, even under a view of the law most favorable to the Government, that evidence so obtained would be excluded. * * *." 408 F2d at 586.

Two state court decisions hold evidence illegally seized is not admissible in a proceeding nominally civil. *Carson v. State*, 221 Ga 299, 144 SE2d 384 (1965); *Carlisle v. State*, 276 Ala 436, 163 S2d 596 (1964). Both of these, however, were at least quasi-criminal, — suits to abate gambling houses as public nuisances.

In *Walker v. Penner*, 190 Or 542, 227 P2d 316 (1951), we stated:

"The Federal rule respecting the suppression of evidence procured by an unreasonable search and seizure, and which rule has been adopted in many states, refers largely, if not entirely, to criminal and quasi-criminal proceedings. * * *." 190 Or at 547.

The doctrine of excluding evidence illegally seized has changed so drastically since this decision that we find it advisable to reinvestigate the issue.

The answer to the question of how broad is the exclusionary rule ought to be found in the reasons for the rule.

The rule started in the federal system in *Weeks v. United States*, 232 US 383, 34 S Ct 341, 58 L Ed 652, LRA 1915B 834 (1914). In that case a United States

Marshall illegally broke into the defendant's home and seized defendant's papers. At a trial of defendant for the sale of lottery tickets, the trial court refused to exclude these from evidence because of the manner in which the government obtained the papers. The United States Supreme Court held they should have been excluded.

In *Wolf v. Colorado*, 338 US 25, 69 S Ct 1359, 93 L Ed 1782 (1949), the Court refused to apply that exclusionary rule to state prosecutions. Mr. Justice Frankfurter wrote:

> "* * * But the immediate question is whether the basic right to protection against arbitrary intrusion by the police demands the exclusion of logically relevant evidence obtained by an unreasonable search and seizure because, in a federal prosecution for a federal crime, it would be excluded. As a matter of inherent reason, one would suppose this to be an issue as to which men with complete devotion to the protection of the right of privacy might give different answers. When we find that in fact most of the English-speaking world does not regard as vital to such protection the exclusion of evidence thus obtained, we must hesitate to treat this remedy as an essential ingredient of the right. * * *
>
> "* * * * *
>
> "The jurisdictions which have rejected the Weeks doctrine have not left the right to privacy without other means of protection. Indeed, the exclusion of evidence is a remedy which directly serves only to protect those upon whose person or premises something incriminating has been found. We cannot, therefore, regard it as a departure from basic standards to remand such persons, together with those who emerge scatheless from a search, to the remedies of private action and such protection as the internal discipline of

the police, under the eyes of an alert public opinion, may afford. Granting that in practice the exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective. * * *." 338 US at 28-31.

*Mapp v. Ohio*, supra (367 US 643), overruled *Wolf v. Colorado*, supra (338 US 25). *Mapp* involved another illegal search and seizure by law enforcement officers and a state criminal prosecution. One of the principal bases stated for overruling *Wolf* was "[t]he experience of California that such other remedies [other than exclusion in criminal cases] have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been recognized by this Court since Wolf." 367 US at 652.

Any confusion about the basis for the exclusionary rule was settled by the reasoning in *Linkletter v. Walker*, 381 US 618, 85 S Ct 1731, 14 L Ed2d 601 (1965). That was another state criminal case in which the illegal search had been conducted by a law enforcement officer. The Court held *Mapp v. Ohio*, supra (367 US 643), would not be applied to cases finally decided prior to the *Mapp* decision. The Court so decided because the reason for the exclusionary rule was to deter lawless police action and this would not be accomplished by excluding evidence which was secured by lawless police action occurring before *Mapp v. Ohio*.

"* * * Mapp had as its prime purpose the en-

forcement of the Fourth Amendment through in-
clusion of the exclusionary rule within its rights.
This, it was found, was the only effective deterrent
to lawless police action. Indeed, all of the cases
since Wolf requiring the exclusion of illegal evi-
dence have been based on the necessity for an
effective deterrent to illegal police action. * * *.

"* * * In rejecting the Wolf doctrine as to the
exclusionary rule the purpose was to deter the
lawless action of the police and to effectively en-
force the Fourth Amendment. * * *." 381 US at
636-637.

This import of the majority opinion in *Linkletter*
is accented by the dissenting opinion of two justices:

"One reason — perhaps a basic one — put
forward by the Court for its refusal to give Link-
letter the benefit of the search and seizure exclu-
sionary rule is the repeated statement that the
purpose of that rule is to deter sheriffs, policemen,
and other law officers from making unlawful
searches and seizures. The inference I gather from
these repeated statements is that the rule is not
a right or privilege accorded to defendants charged
with crime but is a sort of punishment against
officers in order to keep them from depriving
people of their constitutional rights. * * * [T]he
undoubted implication of today's opinion that the
rule is not a safeguard for defendants but is a
mere punishing rod to be applied to law enforce-
ment officers is a rather startling departure from
many past opinions, and even from Mapp itself
* * *." 381 US at 648-649.

We realize that dissenters on occasion "overstate"
the holding of the majority; however, in this instance
we find it inescapable that the majority was holding
that the exclusionary rule for evidence illegally seized
"is not a right or privilege accorded to defendants
charged with crime." If it were, such a right or privi-

lege, it would have to be applied to those tried before *Mapp* as well as after. The assistance of counsel is such a right and, therefore, such right was accorded those tried before as well as after *Gideon v. Wainwright*, 372 US 335, 83 S Ct 792, 9 L Ed2d 799, 93 ALR2d 733 (1963).

Synthesizing *Mapp* and *Linkletter*, evidence illegally obtained by law enforcement officers will be excluded from criminal prosecutions for the purpose of deterring law enforcement officers from taking such illegal action.

The present action, as we stated, is not criminal or quasi-criminal. The state employees conducting the alleged illegal search and seizure were not police officers or other law enforcement officers investigating alleged criminal conduct. Other investigators were employed privately and engaged by the state for their knowledge of diesels. The investigation was instituted by an assistant state forester. The purpose of the investigation was to find the cause of the fire.

We have no information that it is a common practice of state employees investigating the causes of forest fires or of nonlaw enforcement public employees, generally, to engage in unconstitutional searches and seizures in the performance of their duties. Thus there is no known need to deter unconstitutional conduct of such employees, whereas in *Mapp v. Ohio,* supra (367 US 643), the court found there was a need to deter law enforcement officers investigating suspected criminal activity.

Also, we are of the opinion that if nonlaw enforcement government employees do engage in illegal searches and seizures, effective remedies, other than exclusion of evidence obtained thereby, are available.

If the acts of the plaintiffs' agents in this case were illegal, they amounted to the torts of conversion or trespass to personal property. ORS 30.260 et seq. permits tort actions against public bodies. Public employees can be held liable for their torts. ORS 30.280 provides that public bodies may provide liability insurance for their employees, thus creating solvent defendants; and they do. *Hale v. Smith*, 254 Or 300, 460 P2d 351 (1969). At least in this jurisdiction, juries do return verdicts against state employees for conversion. *Mustola v. Toddy*, 253 Or 658, 456 P2d 1004 (1969).①

It could be argued that under the traditional rules of damages, the award would be so trivial that pursuing a civil remedy might not be worthwhile. If this did prove to be the case, we should consider the possibility of changing the traditional rules of damages for this type of case. This approach certainly should be considered as an alternative to changing the rules of evidence and excluding relevant and competent evidence.

There is another important consideration to be considered in determining whether tort recovery is a sufficient remedy in the type of situation we have before us. It is the realization that when we go outside the type of case in which law enforcement officers commit illegal searches and seizures while investigating suspected criminal activities we are generally concerned with individuals who are much more able to redress their wrongs by legal action. Professor Foote has described the inadequacy of tort remedies in

---

① We did reverse the judgment entered upon the jury's verdict for the reason that we found there was no conversion as a matter of law.

correcting Fourth Amendment violations for the typical criminal defendant:

"For most potential tort plaintiffs the 'moral aspects of the case' are not very favorable. Very few of them are persons who are respectable in the sense that they have some measure of status and financial security in society and have acquired the kind of reputation which will be 'damaged' by illegal police activity. Most Police action operates at lower levels of society and the great majority of persons who are subjected to illegal arrests or searches and who are therefore potential tort plaintiffs come from the lowest economic levels, or minority groups, or are criminals or suspected of criminality. For such people 'the rules * * * are little more than mere pretensions.' It is not surprising that attorneys are reluctant to take their cases because of the small chances of a recovery 'sufficient to justify the action,' and fear of police retribution may also be a substantial factor in deterring such plaintiffs from bringing suit. The 'moral aspects' of the cases of these potential plaintiffs ruin their chances of success in court. They lack the minimum elements of respectability which must be present to form a base upon which the fiction of reparation can operate." Caleb Foote, *Tort Remedies For Police Violations of Individual Rights*, 39 Minn L Rev 493, 500 (1955).

We do not believe that these shortcomings apply to tort remedies for the typical defendant in a civil action.

We also find support for our position that a tort remedy is effective for Fourth Amendment violations in civil cases in the fact that even when law enforcement officers investigating criminal activity are involved a tort remedy is not necessarily futile if the person subjected to the illegal police activity is not from the classes described by Professor Foote above.

Plaintiffs' verdicts against police officers for illegal arrests were obtained in *Paget v. Cordes*, 129 Or 224, 277 P 101 (1929) (plaintiff a lawyer and businessman); *Christ v. McDonald*, 152 Or 494, 52 P2d 655 (1936) (plaintiff described as steadily employed and involved in union activities); *Bratt v. Smith*, 180 Or 50, 175 P2d 444 (1946) (plaintiff "a sober and industrious citizen").

These latter decisions illustrate that all persons subject to illegal police activity are not from the group described by Professor Foote; likewise some persons subjected to illegal activity of public employees, other than police investigating crime, will be from such group and, therefore, disadvantaged in attempting to enforce a tort remedy. We must base our decision, however, on the usual circumstances, — what is the usual class of citizens involved.

In addition to a tort remedy, we note that political or administrative action offers an alternative to the exclusionary rule in redressing Fourth Amendment violations. This approach does not offer much help to the typical criminal defendant for many of the same reasons the tort remedy is not helpful. A governor, mayor or police commissioner is not apt to give much credence to a complaint by a person such as Dollree Mapp (*Mapp v. Ohio*, supra (367 US 643)), suspected of harboring a fugitive and paraphernalia used in the policy racket, or Victor Linkletter (*Linkletter v. Walker*, supra (381 US 618)), arrested for one burglary while under a two-day surveillance as a suspect in another burglary.

On the other hand, persons who may be subject to illegal searches and seizures by public employees other than police officers investigating crimes are

apt to be those kinds of persons to whom public officials will listen when complaints are made. For this reason illegal practices of public employees who are not police officers may very well be effectively deterred by political or administrative action.

■ In summary, we do not find that illegal searches and seizures outside the area of law enforcement officers investigating crimes occur frequently. In addition, we have not been shown, if such were the practice, that remedies other than exclusion of evidence would be inadequate to deter the continuance of such practice. On the other side of the ledger, we continue to regard a trial as a search for the truth and, therefore, competent evidence should never be excluded except for the most compelling reason. We hold that illegally seized evidence should only be excluded in a criminal or quasi-criminal proceeding and if obtained by law enforcement officers investigating criminal activity. The order of the trial court excluding the evidence was in error.

■ The defendant contends that even if the trial court's ruling was incorrect, the plaintiffs were not prejudiced. The defendant contends the evidence was otherwise inadmissible because the tests made by plaintiffs' witnesses were not made under conditions comparable to those existing when the roller allegedly threw sparks starting the fire. Defendant states that the conditions were not comparable because the roller was run up against a bank, then "overloaded" by running it at full throttle and then engaging the clutch. The conditions for such test may not be sufficiently similar to those under which the roller was operating at the time the fire was allegedly started and, therefore, inadmissible; on that issue we express

no opinion. However, one of the state's witnesses whose testimony was suppressed testified that the roller threw sparks "even with it out of gear when you throttle it, that is, full throttle for approximately a minute, the sparks would emit from the exhaust stack." These observations would be admissible as the conditions were better than those under which Umpqua operated the roller.

Another assignment of error involves an affirmative defense and an instruction explaining the defense. The issue raised thereby might again arise in the event of another trial. The defendant alleged that plaintiffs were contributorily negligent in failing to notify defendant of weather conditions rendering forests particularly susceptible to fire damage and failing to notify defendant that because of such conditions it was unlawful to operate power-driven machinery in the area.

In bringing this action, plaintiffs are proceeding under ORS 477.064 to 477.085, dealing with fire abatement. The basis for the action, however, is common-law negligence. *Silver Falls Co. v. E. & W. Lbr. Co.,* 149 Or 126, 141-152, 40 P2d 703 (1935). Therefore, unless there are other reasons to the contrary, the general common-law principle that contributory negligence bars a recovery would apply. Plaintiffs claim the general principle does not apply because the plaintiffs were governmental agencies engaged in a governmental activity attempting to recover costs of abating a public nuisance.

In *State v. Shinkle,* 231 Or 528, 373 P2d 674 (1962), we held the doctrine of governmental immunity did not prevent a private defendant from raising the defense of contributory negligence when the defend-

ant was sued by the state for damage to a state vehicle allegedly caused by defendant's negligence. Plaintiffs' attempts to distinguish that decision are unsuccessful. Our reasoning in the *Shinkle* case was: "But we prefer to decide the question, not on the basis of implied waiver, but rather upon the ground that our constitution does not cover the case where the state itself institutes suit." 231 Or at 538.

The fact that the activity is termed "governmental activity," if that has any significance, is of no assistance to plaintiffs. Our former decisions hold that only when the state is acting in a governmental capacity is it immune and *State v. Shinkle*, supra (231 Or 528), held that when the government is immune, if sued as a defendant, such immunity could not be asserted when it commenced the action and the defendant alleged the government was contributorily negligent.

■ The fact that the sum plaintiffs are seeking to recover was incurred in abating a public nuisance is immaterial. The public nuisance was based upon alleged negligence and as stated, the usual principles of common-law negligence are applicable.

ORS 477.670 provides: "* * * [I]f the forest land * * * is susceptible to damage by fire * * * the forester shall issue, and give to each person entering or being upon such land, notice to that effect. Thereafter * * * the use of any power-driven machinery in any operation on such forest land, is unlawful * * *."[2]

---

[2] ORS 477.670: "During a closed season in a forest protection district situated west of the summit of the Cascade Mountains, if the forest land in such district, or any part thereof, is susceptible to damage by fire due to low humidity, high wind or high temperature or due to the existence thereon of an excessive

Pursuant to this statute the trial court instructed the jury that the plaintiffs were contributorily negligent if they failed to give notice to the defendant of severe fire conditions and that it was, therefore, unlawful to use power-driven machinery, and under the circumstances a reasonably prudent person in plaintiffs' position would have given such notice.[9]

The uncontradicted evidence was that the plaintiffs gave notice of the severe fire conditions by commercial news media, through state and federal forest departments, weather bureau teletype, and over a forest industries shortwave network, of which de-

---

amount of flammable debris, or due to a combination of any such conditions, the forester shall issue, and give to each person entering or being upon such land, notice to that effect. Thereafter the use of fire in any form by any person receiving such notice, except for fire control under the supervision of the forester, or the use of any power-driven machinery in any operation on such forest land, is unlawful unless approved by the forester. Approval shall be granted only when in the judgment of the forester the activity will not increase the fire hazard conditions."

[9] "* * * [T]he rules of negligence and the applicable law I have indicated to you make it necessary for the defendants (sic), in their (sic) turn, to prove certain facts by a preponderance of the evidence, in order to prove that plaintiffs were contributorily negligent. These facts are: If the forest lands in the forest protection district involved in this case were at the times involved in this case, that these lands were susceptible to damage by fire due to low humidity, high wind or high temperature or due to the existence thereon of an excessive amount of flammable debris or due to a combination of any such conditions, and if the plaintiffs did, in fact, fail to issue and give notice to the defendant, or its employees who were on the land of these conditions and if plaintiffs did, in fact, fail to notify defendant of any restrictions, modifications — or modifications of defendant's activities or fail to stop defendant's activities completely and if, under all these circumstances, a reasonably prudent person in the place of plaintiff would have given such notice and, in connection with such notice, would have called upon the defendant to modify, restrict or cease its operations, then in that event, defendant would have shown plaintiffs' negligence as alleged. * * *."

fendant apparently was not a member. No personal notice was given defendant.

Plaintiffs contend the trial court in effect instructed the jury that the plaintiffs had a duty to personally give to the defendant notice of the severe fire conditions. We do not so interpret the instruction. The court instructed as the statute stated, — the plaintiff forester had a duty to notify persons of the fire conditions. The court then interpreted the statute not necessarily to require personal notice. The trial court translated this interpretation into an instruction by instructing, in effect, that the notice given must be what a reasonably prudent person, under all the circumstances, would have given.

■ We are of the opinion that the instruction, however, was incorrect in also imposing a duty upon the forester to notify the defendant by any reasonable means, to stop the use of power-driven machinery. The statute does not expressly require such notification and we do not believe such a duty should be implied. The statute provides that when notice of severe fire conditions is given, thereafter the use of power-driven machinery is unlawful. This is an instance when it is reasonable to require persons using power-driven machinery in the woods to know the law. The state forester has, as a matter of practice, at least on occasion, accompanied the notice of severe fire conditions with a notice that the use of power-driven machinery was unlawful. This practice does not impose on plaintiffs a legal duty to give such notice. No showing has been made that anyone was misled by this practice or relied upon it.

■ Plaintiffs contend that any failure to give sufficient notice of the fire conditions could not be preju-

dicial because the defendant had knowledge of the conditions. The defendant knew it was hot and dry and some wind was blowing, but that alone is not sufficient to put defendant on notice that conditions were such as to make the use of power-driven machinery unlawful. "Hot" and "dry" are relative conditions and ORS 477.670 contemplates that the forester shall make a determination of when conditions have become so dangerous that operations must be closed down and then issue notice of his decision.

The defendant, in the event we decided that the order granting the motion to suppress was error, has asked us by cross-appeal to hold that the trial court erred in denying defendant's equitable defense. As previously stated, this defense was that the plaintiffs' examining and operating the roller had altered the machine and thus prevented the defendant from making relevant tests upon it.

Defendant's principal charges against the plaintiffs are that they loosened carbon in the stack, which caused carbon "to come down on things"; they operated the engine without one of the air cleaners in place; and they put the machine under an extremely heavy load by placing it against a bank where it could not move and then putting it in gear and accelerating.

This is an equitable matter and we try it de novo. The evidence was that some carbon was loosened and subsequently was deposited where it might be sucked into the engine if the engine were operated without the air cleaner. One air cleaner was removed and the engine was operated for perhaps as long as 15 or 20 minutes with the air cleaner off. The engine was being warmed up during this time and the clutch was not

engaged. There may have been some dust and particles from the fire floating in the air near the engine at this time. The blower is capable of sucking in particles when not screened by the air cleaner.

The defendant states that all witnesses testified that the engine was in good condition before the fire. At least one of the state's witnesses, Mr. Takayama, did not share that opinion.

The defendant had tests made of the roller on September 2, 1966, about a week after the state's witnesses operated the roller, to determine if the roller could have caused the fire. At this time defendant states the roller was still in good shape. It contends, however, the motor thereafter deteriorated and when it finally learned of the kind of tests plaintiffs had conducted, it was impossible to conduct tests by which it could show the error of plaintiffs' test results.

■ We find, as did the trial court, that the defendant was able to and did conduct adequate examinations and conduct sufficient tests in September 1966 to enable it to present its defense. In addition, we have doubt whether the actions of the state's witnesses substantially changed the condition of the roller. We have read the testimony of the expert called by defendant, Mr. Nelson, and we do not believe he was convinced that the deteriorated condition of the roller in 1967, a year after the fire, was due to the action of the state. We hold that the trial court was correct in finding against the defendant on its affirmative defense.

Reversed and remanded.