# McGrorey v. Obermayer, Rebmann, Maxwell & Hippel

336

*John J. O'Brien, Jr.,* for plaintiffs.
*J. Bruce McKissock,* for defendants.

TAKIFF, *J.,* June 22, 1978—Presently before the court are plaintiffs' motions for judgment notwithstanding the verdict and for new trial. After review of the record, briefs, and oral argument held, plaintiffs' motions are denied.

## I. INTRODUCTION

Plaintiff Claire McGrorey sustained a severe injury in 1970 when the Volkswagen automobile in which she was a front seat passenger was involved in a one-car accident. Defendants herein, an attorney and the law firm of which he was a partner, were retained by the McGrorey family to represent them. A lawsuit brought by defendants on plaintiffs' behalf against the driver of the vehicle was concluded by settlement in the sum of $200,000.

Since Claire was a minor at the time of the settlement, the proceeds were placed in a trust account for her benefit with a local bank which, in 1973, invested in common stocks. By October, 1974, when the stocks were distributed in kind to Claire, the market values had declined by over $40,000. It was at this time tiffs, apparently mistakenly believing that the present defendants were counsel to that bank, contacted their present counsel in an effort to possibly recover some or all of these investment losses.

On October 25, 1974, an action was commenced on behalf of Claire objecting to the account filed by the bank. Also during October, 1974, present counsel filed the instant action as well as a lawsuit in the United States District Court for the Eastern District of Pennsylvania against Volkswagen. The latter suit was dismissed with prejudice on the ground that any products liability action against Volkswagen was barred because the statute of limitations had run on September 15, 1974.

In an adjudication dated December 31, 1975, President Judge Taxis of the Montgomery County Court of Common Pleas, Orphans Court Division, confirmed the trustee's account and rejected plaintiffs' assertions of improper investment of Claire's

funds. He specifically held that: "Claire and her parents expected a long term investment program and knew of the investment in common stocks" and the bank "acted properly in investing in common stocks which would satisfy (1) the income needs of Claire and (2) her and her parents' objective of growth in her account on a long term basis." McGrorey Estate, 26 Fiduc. Rep. 67, 74, 75 (1975).

The instant action is a malpractice suit against defendants for allegedly negligently failing to prosecute a claim on plaintiffs' behalf against Volkswagen of America for claimed defective design which allegedly was a substantial factor in causing Claire McGrorey's injury. In particular, it is asserted that defectively inadequate "travel" in the front end suspension system of the Volkswagen caused Clarie McGrorey to strike her head against the roof of the Volkswagen when the vehicle mounted a curb prior to its collision with a tree, and that the contact of her head against the roof was the effective cause of her present disability. Defendants respond that they did not violate the standard of care owed by them to their clients, since they thoroughly investigated the matter and reasonably concluded that a lawsuit against Volkswagen was without basis in fact. They further assert that plaintiffs cannot recover because, even if defendants were negligent in not initiating and prosecuting a claim against Volkswagen, such a suit would not have been successful since (1) the Volkswagen was not defectively designed, and (2) any defect in the Volkswagen's front suspension was not a substantial factor in causing Claire McGrorey's injury; she was injured when her head hit the windshield upon the car's striking the tree, and not earlier when the car mounted the curb.

In addition to the foregoing assertion of negligence, in their complaint plaintiffs alleged, inter alia, that defendants were negligent for recommending acceptance of the settlement against the driver of the vehicle and his mother, and for not bringing suit against Lower Merion Township, Lankenau Hospital, and the physicians at Lankenau who treated the injured minor. Plaintiffs further averred that defendants should bear the responsibility for the purported mishandling of Claire's funds, derived from the settlement, by a bank chosen to invest those funds. By the conclusion of the trial, however, all these additional claims were voluntarily withdrawn.

• • •

[T]he jury found that the front end suspension system of the subject Volkswagen was not defectively designed. Therefore, verdict was entered for defendant. The instant motions were thereafter filed.

• • •

### III.  POST-TRIAL MOTIONS

Plaintiffs aver the following in support of their motions: (1) that the court erroneously permitted defendants to exhibit to the jury motion pictures depicting an out-of-court experiment with a Volkswagen; (2) that the court erroneously failed to permit the reading to the jury of plaintiffs' pre-trial requests for admissions that were denied generally by defendants; (3) that the court erroneously instructed the jury that in order to find for plaintiffs they must find that plaintiffs "would have recovered" against Volkswagen if suit had been instituted by the present attorney defendants against that company originally; (4)  that the court abused

its discretion by curtailing cross-examination of defendant Alan Kauffman; and (5) that the court erroneously failed to instruct the jury that because defendants permitted the statute of limitations to expire with respect to an action against Volkswagen, they were therefore negligent and liable to plaintiffs.

## A. Motion Pictures

Plaintiffs' theory of liability asserted at trial against defendants was that defendants were negligent in failing to adequately investigate and thereafter assert a products liability and/or breach of warranty claim as to the manfacturer and/or seller of the Volkswagen operated by Frank Canuso. To support the validity of such a claim, in accord with the prevailing "case within a case" requirement in the proof of a legal malpractice action, plaintiffs undertook to prove that if such a suit had been commenced by defendants, it would have been successful.

Central to this contention was the testimony of Messrs. Merz and Kornhauser, two experts called by plaintiffs to narrate their opinions regarding the purportedly defective Volkswagen. Merz testified that a 1970 Volkswagen, when loaded with occupants of the same weight as the persons in the Canuso vehicle at the time of the accident, had only nine-sixteenths of an inch of "stroke" or "travel" remaining in its front end suspension shock absorbers. Due to this limited "stroke," Merz opined that the front end suspension of the Volkswagen was defectively designed even for normal operation on the highway. Kornhauser, in response to a more specific inquiry, testified that a vertical impact to the front end caused by striking a curb three and

three-quarter inches high would, in his opinion, and under other assumed conditions, cause the suspension system to "bottom-out" or become ineffective. This, he stated, would result in the transfer of all of the vertical forces applied to the front wheels directly to the vehicle frame, thence upward to its seats and the occupants thereon.

In order to rebut this evidence of a design defect and its causal relationship to Claire McGrorey's injuries, defendants consulted with the Calspan Corporation, a Buffalo, New York engineering concern. Calspan performed dynamic experiments involving a moving Volkswagen mounting curbs of varying heights at different speeds and various approach angles; these experiments were filmed by Calspan and exhibited to the jury during defendants' case. Plaintiffs assert that these filmed experiments were erroneously introduced in evidence. We disagree.

In these experiments, Norris Shoemaker, the head of the experimental test section of the Calspan transportation research department, drove a 1970 Volkswagen over curbs of three and three-quarter and two and one-half inches in height and at approximate speeds of 20, 30, 35 and 38 miles per hour. The angle of impact on the several approaches was varied between 20 and 30 degrees. The test Volkswagen was a 1970 model manufactured in July 1969, equipped with its original parts. Inside the vehicle, in addition to Shoemaker, were Elizabeth Goodier in the right front passenger seat, and Robert Scott, a photographer, in the rear seat. Two 16 mm motion picture cameras were used to record the experiments—a Canon camera provided a frontal view of the vehicle at impact, while an Arriflex camera filmed the movement of the right

front passenger during the various trial runs over the curbs. Calspan spliced the two films to provide a sequential showing of the respective exterior and interior views at each combination of curb height, speed and impact angle.

These motion picture films depicted an experiment seeking to replicate an event as represented in narrative testimony offered by plaintiff. To judge the propriety of admission of this film, evidential concepts relating both to the admissibility of motion pictures and to experiments must be considered. The former shall be discussed first.

It is clear that a motion picture, if properly authenticated, is admissible in evidence, e.g., DeBattiste v. Laudadio & Son, 167 Pa. Superior Ct. 38, 74 A. 2d 784 (1950); Com. v. Roller, 100 Pa. Superior Ct. 125 (1930); John B. Kelly Co., Inc. v. Davis, 8 Pa. Commonwealth Ct. 589, 303 A. 2d 255 (1973). For it to be authenticated, a motion picture must be shown to be a faithful and accurate reproduction of the objects and action which it depicts. The trial judge, in the exercise of sound discretion, is to make this determination. See, e.g., Semet v. Andorra Nurseries, Inc., 421 Pa. 484, 219 A. 2d 357 (1966); Puskarich v. Trustees of Zembo Temple, 412 Pa. 313, 194 A. 2d 208 (1963); Nyce v. Muffley, 384 Pa. 107, 119 A. 2d 530 (1956); Luther v. Maple, 250 F. 2d 916 (8th Cir. 1958); International Union United Aircraft, etc. v. Russell, 264 Ala. 456, 88 So. 2d 175, 62 A.L.R. 2d 669 (1956), aff'd 356 U.S. 634 reh. den. 357 U.S. 944 (1958). Authentication and the opportunity, fully afforded here, for cross-examination of the witness testifying as to accuracy, provide protection against the prejudicial change or falsification of a film. See People v. Dabb, 32 Cal. 2d 491, 197 P. 2d 1 (1948); Heiman v. Market Street Ry. Co., 21 Cal. App. 2d 311, 69

P. 2d 178 (1937). The authenticating witness need not be the person who actually photographed the scene: Semet v. Andorra Nurseries, Inc., supra.

Ample qualifying testimony was presented to indicate that the motion picture was a faithful and accurate depiction of the experiment. Because of the absence of precision in plaintiff's testimony as to the speed, height of curb at point of entry and angle of approach, alternative combinations were appropriate for the experimental demonstration. Norris Shoemaker, the vehicle driver present at the experiment, identified the specific types of cameras used, their location, and their operating speed. He explained that, at his direction, the films of each individual experimental run were spliced together in order to provide a coherent and comprehensible sequence of relevant presentation. As the film was viewed, Shoemaker identified each segment as to vehicle speed, approach angle and curb height. Shoemaker did not explicitly testify that the films accurately showed the experiments; neither defendants' nor plaintiffs' counsel chose to ask that question directly. However, the inference necessarily drawn from his detailed testimony is that the motion picture accurately depicted the events portrayed. This conclusion is inescapable given the evidence of camera location and film operating speed along with a lack of any indication of improper manipulation of the photographic processes utilized in taking, developing and splicing the film.

The fact that the film was spliced does not alone preclude its admissibility. See McGoorty v. Benhart, 305 Ill. App. 458, 27 N.E. 2d 289 (1940); International Union v. Russell, supra. While the film was comprised of spliced segments, it is of more significance that each individual segment

was shown without alterations. Without changes affecting the footage of the actual experiments, any splices occurring elsewhere in the film are of little or no import. The jury was informed how and why the inter-sequence editing was performed, and the jury was free to take this into consideration when reviewing the credibility and weight to be given to the motion picture.

We regard the lack of information regarding projector speed in a similar light. Unlike other possible situations, the projected speed of the film was not critical in the instant case. The speed of the vehicle was testified to by Shoemaker, so for this reason alone the lack of knowledge of the exact speed of projection was not of sufficient importance to bar the admission of the motion picture. Further, the apparent (not the actual) speed of the vehicle under test was collateral to the ultimate fact issue which the jury was charged to resolve: that is, whether the Volkswagen suspension was defectively designed. The thrust of the motion picture was the graphic portrayal of the reaction of the car and the right front passenger to an impact with a curb at varying speeds of travel and curb heights; the nature of body movement and reaction, in absolute terms of movement, is not affected by the speed of the motion picture projection. Finally, the speed of the projector if incorrect at all, was not, so apparently erroneous that the film would have tended to unduly confuse or prejudice the jury to the point where it should not have been presented for their consideration. We do not feel that the mere *possibility* of a minor speed inaccuracy in the speed at which the film was exhibited should deprive a jury of a pictorial communication of observations which otherwise would have to be established by the pos-

sibly less comprehensible mode of oral testimony verbally describing a physical occurrence during a sequence of experimental runs.

Having found the motion picture in and of itself to be admissible, we now turn to the requirements for the admissibility of the experiment depicted therein. The Superior Court stated in Clover Bar, Inc. Liquor License Case, 203 Pa. Superior Ct. 11, 14, 198 A. 2d 366 (1964), that:

"Experiments for use in a trial to be admissible are normally held to a very strict standard and must be thoroughly authenticated before being admitted and this for the very good reason that normally the possibility exists of great divergence of conditions and the existence of a great many variables which could affect any given result."

Stated in alternative terms: "Experimental evidence is admissible so long as it is relevant and probative, and such evidence has probative value if the conditions of the experiment are identical with or similar to the conditions of the transactions in litigation." Glick v. White Motor Co, 458 F. 2d 1287, 1294 (3d Cir. 1972); Crown Cork & Seal Co. v. Morton Pharmaceuticals, Inc., 417 F. 2d 921 (6th Cir. 1969); Weaver v. Ford Motor Co., 382 F. Supp. 1068 (E.D. Pa. 1974), aff'd without opinion, 515 F. 2d 506, 507 (3d Cir. 1975). The conditions of the experiment and of the actual occurrence must be sufficiently similar to permit a logically relevant inference. Once similarity is established, differences, if any, between the experiment and the actual event go only to the weight to be given to the experimental evidence: Hopkins v. E. I. Du Pont De Nemours & Co., 199 F. 2d 930 (3d Cir. 1952). The admission of evidence based upon experiments is a matter

which rests within the sound discretion of the trial court. See, e.g., Glick v. White Motor Co., supra; Hopkins v. E. I. Du Pont De Nemours & Co., supra; Weaver v. Ford Motor Co., supra; Zurzolo v. General Motors Corp., 69 F.R.D. 469 (E.D. Pa. 1975). In the exercise of its discretion, the court should weigh the probative value of the experimental evidence, essentially the extent of similarity of experimental conditions with the litigated happening, against the dangers of confusing the issues before the jury, unfair surprise, undue prejudice, and undue consumption of trial time. See Balian v. General Motors, 121 N.J. Super 118, 296 A. 2d 317 (1972); 2 Wigmore, Evidence §§443, 444; McCormick, Evidence §202; see, generally, Utz, Use of Moving Pictures in Out-of-Court Experiments, 8 Defense L.J. 71 (1960).

We consider first whether the experiment was sufficiently similar to the circumstances of the accident in order that it be deemed relevant to the defective design issue. Next, we will examine whether plaintiffs' claim of unfair surprise offsets the probative value of the experiment.

The motion picture portrayed 16 test runs of a Volkswagen "Beetle" mounting a curb. The Volkswagen was the same model and was manufactured the same model year as the Canuso vehicle. Shoemaker testified that the front suspension system, tires, and tire pressures on the experimental vehicle all comported with the specifications in the appropriate owner's operating manual and that only original equipment parts were on the suspension system of the test vehicle. In the test, the right front passenger weighed 113 pounds, the rear passenger 165 pounds (with camera equipment), and the driver weighed 150 pounds; by agreement of

counsel, Claire McGrorey weighed 112 pounds, Larry Frantz weighed 155 pounds and Frank Canuso weighed at least 112 pounds at the time of the accident. The test Volkswagen was operated at approximate speeds of 20, 30, 35 and 38 miles per hour; Frantz testified that the Canuso vehicle entered the intersection which was the site of the accident at a speed "like thirty miles an hour, *in that range.*" (Emphasis supplied.) Curbs of three and three-quarter inches and two and one-half inches were used by the experimenters. Merz, one of plaintiffs' experts, testified that the curb measured from one and one-half to four inches in height along the entire east side of North Bowman Avenue in the general area where the Canuso vehicle mounted it. As previously indicated, the place of the accident is a radial T intersection and the precise angle of turn and mounting of the curb by the Canuso vehicle was never established. The experiments were therefore conducted at alternate angles.

This comparision of the conditions of the experiment and of the actual accident demonstrates their substantial similarity in the essential particulars. The range of curb heights, speeds and varying approach angles was necessarily utilized by the experimenters in order that the effect of each possible alternative combination in evidence could be demonstrated to the jury. The question of which of the test runs most closely approximated the conditions of the actual happening was of necessity a question for the jury's determination.

Some differences could have existed between the test and Canuso vehicles in regard to their front suspensions and the weight of the occupants. Thus, the Canuso Volkswagen was essentially new at the

time of the accident, while the test vehicle was manufactured seven years prior to the experiment. However, if this difference in age and/or usage did affect the comparative shock absorption ability of the respective vehicles, it would have been the test vehicle which would have had the less efficient suspension system. According to the testimony of Merz, shock absorbers wear out with use and become less able to perform their function. Therefore, any differences between the actual and test vehicles due to dissimilarly responsive front suspensions would have worked to plaintiffs' advantage, since such differences would have made the test vehicle's suspension less efficient and, in plaintiffs' contention, more defective, than that of the Canuso vehicle.

In a similar analysis, if the test vehicle carried more weight than the Canuso vehicle, the additional weight would have increased the likelihood of the demonstration of a defective suspension. Merz testified that the stroke of the Volkswagen shock absorber would decrease by one inch for each 70 pounds of weight applied to it in a static test. When the combined weight of Claire, Frantz, and Canuso was considered, he testified only nine-sixteenths of an inch of stroke remained. Hence, if the test vehicle carried a load which, in the worst case, was 49 pounds greater than that carried by the Canuso vehicle, according to Merz' data and testimony, no stroke whatsoever would have remained in the test Volkswagen's shock absorber. The test vehicle's front suspension would have been in a "bottomed-out" state when the passengers entered it, purportedly a more defective condition than the Canuso vehicle was in when it actually hit the curb. As with the possible difference in

front end suspension efficiency, this possible difference may have been beneficial to and was not at all prejudicial to plaintiffs. Therefore, plaintiffs may not assert these differences as the basis for their assertion that the film lacked probative value to the instant matter. Cf. People v. Spencer, 58 Cal. App. 197, 208 Pac. 380 (1922); State Forester v. Umpqua River Navigation Co., 258 Or. 10, 478 P. 2d 631 (Ore. 1970). Further, the differences which may have been helpful to plaintiffs serve to offset those which could have benefited defendants. In general, it can be assumed that the jury, exercising ordinary intelligence, made whatever allowances were necessary for the above discussed and any other insubstantial dissimilarities between the experiment depicted in the film and the actual accident in suit. Cf. St. Paul Fire & Marine Ins. Co. v. Baltimore & Ohio Rd. Co., 129 Ohio St. 401, 195 N.E. 861 (1935). Plaintiffs were given ample opportunity to cross-examine defendants' experts as to these differences. See Zurzolo v. General Motors Corp., supra.

Also a matter of weight for the jury was the omission in the film of views of the hands of the right front passenger and the vehicle's speedometer. Oral testimony was presented concerning the location of the front passenger's hands and the speed of the vehicle as part of the foundation for the film. Therefore, the omission of such views in the motion picture is not of import; their inclusion would have merely constituted cumulative evidence to the oral testimony.

Plaintiffs contend that they were unfairly surprised by the introduction of the film depicting the experiment. In this regard they apparently rely upon Balian v. General Motors, 121 N.J. Super.

118, 296 A. 2d 317 (1972). We do not believe that plaintiffs were unfairly surprised by the motion picture under Balian or any other standard.

Even if Balian were authoritative precedent within this Commonwealth, the circumstances which the Balian court considered to constitute unfair surprise do not exist in the case sub judice. The plaintiffs in Balian had procured a formal order requiring defendants to submit to plaintiffs, within five days of trial, copies of the reports rendered to them by their experts. There, defendants received from plaintiffs copies of reports which supplied sufficient information to enable them to prepare a motion picture of an experiment in rebuttal *before* the start of trial. Defendants produced such a film, but did not give notice of their intention to produce it to plaintiffs; plaintiffs did not obtain knowledge of the existence of the film until its presentation in court.

In contrast, in the instant case defendants were not aware of the substantive details in support of plaintiffs' experts' conclusions until after the start of trial. As is obvious, defendants' experts, who were identified pre-trial, could not prepare their own evidence to rebut plaintiffs' contentions until they were in receipt of the necessary substantive data. Thereafter, the experimental tests were ordered and as soon as defendants' counsel was informed of the completion of the first series of experiments he notified plaintiffs' counsel of the experiments, the conditions under which they were conducted, and the results thereof. Before the film was viewed by the jury, plaintiffs' counsel was given an opportunity to view the film in camera.

Under these circumstances elements of unfair surprise sufficient to overcome the probative value of the filmed experiment proffered to rebut plain-

tiffs' expert opinion testimony are absent. Defendants gave all possible notice to plaintiffs concerning their intention to present a film and what it would depict. Plaintiffs had an opportunity to preview the film and to extensively cross-examine the experts who conducted the experiments and supervised the filming. After showing, plaintiffs' counsel was permitted to take the film to an expert of his own choice to investigate the possibility of any technical tampering. Defendants did apprise plaintiffs of the identity of their experts pre-trial; this should have put plaintiffs on notice that rebuttal evidence of some sort would be forthcoming. By virtue of this notice, plaintiffs had full opportunity to adjust their strategy in anticipation of defendants' experts' evidence. The fact that the rebuttal evidence took the form of filmed rather than orally described experiments does not and should not alone constitute unfair surprise.

Unlike Balian, where plaintiffs did not have the opportunity to prepare effective rebuttal to unanticipated filmed experiments, in the instant matter it is the defendants who were restricted in time for the preparation of their rebuttal evidence due to *plaintiffs'* delay in furnishing them with critical facts concerning the basis of their experts' testimony. Plaintiffs cannot cry surprise when it is their delay which causes its creation. It is defendants who would have been unduly prejudiced by the exclusion of their filmed experiment when it necessarily had to be produced during the course of trial after the factual foundation testimony had been introduced by plaintiffs; all feasible notice of their intention to introduce the rebuttal evidence was given to plaintiffs.

• • •

## C. Jury Instruction

As in any negligence action, a plaintiff in a legal malpractice action, in order to prevail, must prove a duty, the breach of that duty, and damages. The nexus between the concept of fault with the reality of damage is causation, and in a legal malpractice action based upon the failure of an attorney to prosecute a claim, causation (like damage) is established by proof that, absent the attorney's negligence, the client *would have* recovered on his neglected cause of action if it had been properly pursued. This is the accepted underpinning of the "suit-within-a-suit" theory espoused by the case law and the commentators. E.g., Duncan v. Lord, 409 F. Supp. 687 (E.D. Pa. 1976), citing Livingston v. Cox, 6 Pa. 360 (1847); Hurd v. Dimento & Sullivan, 440 F. 2d 1322 (1st Cir. 1971), cert. denied 404 U.S. 862, rehearing denied, 404 U.S. 961 (1971); Pusey v. Reed, 258 A. 2d 460 (Del. 1969); McLellan v. Fuller, 226 Mass. 374, 115 N.E. 481 (1917); Glenna v. Sullivan, 245 N.W. 2d 869 (Minn. 1976); Campbell v. Magana, 184 Cal. App. 2d 751, 8 Cal. Rptr. 32 (1960); Freeman v. Rubin, 318 So. 2d 540 (Fla. App. 1975); Gladden v. Logan, 28 A.D. 2d 1116, 284 N.Y.S. 2d 920 (1st Dept. 1967); See, e.g. Attorney's liability for negligence in preparing or conducting litigation, 45 A.L.R. 2d 5 (1956); 7 Am. Jur. 2d Attorneys at Law, §190; 14 Am.Jur.Trials, Professional Negligence-Attorneys §34; 1A Frumer et al., Personal Injury, §§1.04[6][d], 3.01[2]; Belden et al., Professional Liability of Lawyers in Pennsylvania, 10 Duquesne L.R. 317, 44 Pa. Bar Assn. Q. 38 (1972); Mallen and Levit, Legal Malpractice §§73, 322, 323, 326, 328, 415, 417 (1977).

In this regard, the trial judge charged the jury:

"The thrust of the plaintiffs' contention is that the defendant was negligent in failing to adequately and appropriately investigate the plaintiffs' claim in accordance with the legal standard, and but for such failure, an action would have been prosecuted against the Volkswagen company and *would have been successful* in obtaining a verdict against that company in favor of the plaintiff because the Volkswagen was defectively designed, and that that defect in design was the cause of the plaintiff's injury.

"Volkswagen is not a party to this present suit. What the plaintiffs are essentially contending in this case and what you must resolve is whether on all of the evidence which has been submitted to you that if a law suit against Volkswagen was proper and should have been brought by the defendant Kauffman, and if Volkswagen had been sued and the evidence submitted in connection with the claim for design failure and defective product had in fact been demonstrated to the satisfaction of the jury, that there then *would have been a verdict* in favor of the plaintiff. Had that been the fact, the amount of your verdict must be calculated in terms of what a jury would have awarded as damages in favor of the plaintiff in any action against Volkswagen. Had such an action been brought, if a verdict *would have been rendered* against Volkswagen and in favor of the plaintiff, then that verdict, if one might or *would have been rendered* in favor of the plaintiff in a suit against Volkswagen, successfully prosecuted, that verdict would be the measure of damages that the plaintiff would sustain in this case by reason of the failure of the defendant to bring such an action. So if you conclude

that the plaintiff has prevailed in proving that the defendant was negligent in failing to bring a law suit against Volkswagen, and if you next conclude that in a suit against Volkswagen the plaintiff *would have been successful* in proving that there was a design failure and *would have been successful* in proving that that design failure was the cause of her injury and not the striking of the tree, then you would determine what kind of verdict *would that jury have given* in that case, because to the extent that the plaintiff would have been deprived of getting that jury to render that verdict, that is the extent of her damage or injury as a result of the defendant's original negligence and *would be the measure of damages* in this case.

"That may sound complex, but I trust you will follow it and understand it. If the defendants are liable under all the facts and the law which are now before you, it is that verdict which *would have been rendered* against Volkswagen which is the measure of damages that they have been deprived of, that the plaintiffs have been deprived of in this case." (Emphasis supplied.)

Plaintiffs assert that within the above portion of the charge the court committed "reversible error by placing upon plaintiffs an impossible burden of proof," since it instructed the jury "that it must find that the plaintiffs, before some non-existent jury in a law suit never instituted against Volkswagen, would have recovered against Volkswagen." Inasmuch as the charge substantially comported with the prevailing standard in legal malpractice cases of the present kind, we find plaintiffs' contention to be without merit.

• • •

## E. Statute of Limitations

The sole basis for plaintiffs' motion for judgment notwithstanding the verdict is the assertion that defendants are liable merely because they permitted the statute of limitations to expire without asserting plaintiffs' putative claim against Volkswagen. This contention fails.

The mere expiration of a statute of limitations as to a theoretically available cause of action does not compel the conclusion that defendants violated the standard of care owed by them to their clients. See Davis v. Associated Indemnity Corp., 56 F. Supp. 541 (M.D. Pa. 1944); Parker-Smith v. Prince Mfg. Co., 172 App. Div. 302, 158 N.Y.S. 346 (1916); but see Frischetti v. Bierman, 128 N.J. Super. 290, 319 A. 2d 781 (1974). In Enterline v. Miller, 27 Pa. Superior Ct. 463 (1905), the Pennsylvania Superior Court set down the standard of care to be expected from attorneys in the Commonwealth. (The court in its charge to the jury substantially followed Enterline in outlining to the jury the standard of care owed by defendants to plaintiffs.) The opinion in Enterline specifically stated, at p. 467:

"An attorney is not liable to his client for a failure to succeed, resulting in loss to the client, unless this is due to his mismanagement of the business intrusted to him, through bad faith, inattention or want of professional skill. . . . [H]e must, at least, be familiar with the well-settled principles of law and rules of practice which are of frequent application in the ordinary business of the profession; must observe the utmost good faith toward his client; and must give such attention to his duties, and to the interests of his client, as ordinary prudence de-

mands, or members of the profession usually bestow."

Under the Enterline standard, an attorney may still fully satisfy the duty of care which he owes to his client although he has decided not to assert a particular claim on his client's behalf because it is without adequate basis. An opposite conclusion would compel the untenable conclusion that an attorney could be held negligent for not filing a frivolous or unwarranted lawsuit even though he exercised the requisite degree of skill and care in not doing so which an attorney would have ordinarily exercised under similar circumstances. Further, it could render an attorney negligent for following the ethical rules of the profession which prohibit the assertion of claims which are in bad faith or are otherwise unwarranted: D.R. 7-102(A). See D.R. 7-101(B); Pa.R.C.P. 1023(b).

Besides lacking merit on the foregoing ground, plaintiffs' contention must fail, for even if an attorney is negligent for failing to assert a claim, in order to prevail the client must still establish that the underlying unprosecuted claim was a recoverable one. See section III C of this opinion, supra. Plaintiffs themselves concede this in their brief when they state that "it is negligence for an attorney to permit the statute of limitations to expire on a *valid* claim of one of his clients (emphasis supplied)." See Campbell v. Magana, supra. In the instant matter the issue of whether the underlying "case-within-a-case" was "valid" was submitted to the jury. They concluded that it was without merit, deciding that the Volkswagen was not defectively designed. Since this threshold question of fact was presented and resolved by the jury, judgment n.o.v. is inappropriate on this ground.

Wherefore, we enter the following

### ORDER

And now, June 22, 1978, upon consideration of plaintiffs' motion for judgment n.o.v. and for new trial, it is hereby ordered and decreed that said motions are denied.