Ann E. SALSBERRY et al.,
Plaintiffs-Respondents,

v.

ARCHIBALD PLUMBING & HEATING
CO., INC., Defendant-Appellant.

No. KCD 29709.

Missouri Court of Appeals,
Western District.

Sept. 4, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 1, 1979.

Application to Transfer Denied
Nov. 14, 1979.

Wendell E. Koerner, Jr., St. Joseph, for defendant-appellant.

Patrick McLarney, Allen S. Russell, Kansas City, for plaintiffs-respondents.

Before WASSERSTROM, C. J., and SHANGLER, DIXON, SWOFFORD, SOMERVILLE, TURNAGE and CLARK, JJ.

PER CURIAM:

Plaintiffs, remarried widow and nine minor children, received a verdict for $50,000 damages in a claim for the wrongful death of their husband and father, Ernest E. Salsberry, which occurred as the result of an explosion on June 19, 1969. From the ensuing judgment, defendant Archibald Plumbing & Heating Company, whose negligence in causing or permitting the escape of natural gas is claimed to have caused the explosion and resulting death, has appealed to this court.

We affirm the judgment.

The explosion occurred in Building No. 9, one of several apartment buildings under construction in a project known as East Side Apartments in St. Joseph, Missouri. Decedent Salsberry worked for the painting contractor, and he and four other painters were concluding their day's work at about 4:25 o'clock in the afternoon and were preparing to leave the site. Two of them had that day been spraying lacquer throughout the building. The basement apartment of Building No. 9 was being used as "the painters' shop," where their supplies and paints were stored and where they changed clothes and cleaned up. Decedent Salsberry and another painter had completed moving the supplies and paints there from another building only shortly before the explosion, although some lacquer, paint and thinner had been stored there some days or weeks. Salsberry, along with the foreman, Jack Forson, and the three other painters were in the first floor apartment. (The same apartment is sometimes called the first

floor apartment and sometimes the basement apartment. It was about half below ground and half above.) When someone hollered, Forson looked up to see a "flash," a "flame," cross the ceiling of the living room, "and maybe in the hallway," followed by the explosion. Forson was badly burned and Salsberry was killed.

The gas pipes in the building had been installed by defendant Archibald and it was plaintiffs' theory that there were leaks in the gas pipes within the building which permitted the escape of natural gas, thereby causing the explosion and its consequences.

Defendant maintained that natural gas had never been admitted into the gas pipes in Building No. 9, and that the explosion was caused by an accumulation of lacquer fumes. The lacquer being used by the painters and stored in the basement apartment consisted of about 70 percent volatile solvent. Thinner stored in the apartment and used to clean brushes and equipment was 100 percent solvent.

With this brief factual background, we will take up defendant's points of error, stating additional evidence as necessary in dealing with the point under consideration.

*Prima facie case.*

■ We must first deal with the question whether a prima facie case was made by plaintiff. Defendant stoutly maintains that plaintiff's case must fail because there was no proof that the gas cock, or valve, which would have admitted gas from the gas main into the Building No. 9 system, had ever been opened at the time of the explosion. It objects for the same reason to plaintiff's verdict-directing instruction, and to the opinion evidence of expert witnesses, Dr. Frank Fowler and Dr. Fred Kurata, that the explosion was caused by natural gas.

Indeed there is no direct evidence of the fact that the gas cock had been open at any time. Only one witness, Verne Ray, had actually inspected the gas cock soon after the explosion. He had done so about 20 minutes thereafter at the instance of an Archibald foreman, Sam Worley, who had died before trial. Witness Ray said the

valve was shut. Construction superintendent Larsen had found the gas cock in closed position later that evening. A photograph of the gas cock is not clear enough to show that gas cock was completely closed. No one testified he noticed whether the gas cock was open or closed before the explosion.

The gas supply for the entire project, which seems to have consisted of 13 buildings, entered through a valve at the gas meter. From there a four-inch underground gas main served all the buildings. The gas flow into each building was controlled by an above-ground gas cock, or valve. The parties do not suggest that gas could have entered the building otherwise than through this open gas cock. Externally the valve was controlled by a bar which was parallel to the gas pipe when open, and at right angles with it when closed. It could be closed or opened with a pipe wrench or at least a 10-inch crescent wrench. It could not be closed or opened by hand.

Witness Angold, a plumber and an Archibald employee, was working with another plumber at the project on the date of the explosion. The other plumber, Sam Worley, had died before the trial. It was their task on this date to get another building, Building No. 5, ready for occupancy by getting the hot water heater connected. They had opened the valve at the meter which had admitted the gas into the main which supplied all the buildings in the project, at about 11 o'clock a. m. Before doing so, however, they had separated from each other to check the gas valves to the individual buildings for the purpose of closing any found to be open. Although the gas pipes would be capped off inside the building, they took the precaution of closing the valves outside the building. Usually the valves would arrive and be installed in closed position, witness Angold said, but occasionally one would be open. The witness did not remember whether the gas cock at Building No. 9 was one of those which he had checked. The gas lines were not connected to the appliances in Building

No. 9, but were capped off. Apparently this was the first time that gas had been admitted to the main at the project. There was no reason for the gas to be turned on in Building No. 9.

Angold turned off the gas at the meter as he left work after the explosion. It had been turned off at that point for perhaps two hours to allow the repair of a low point valve, and for another period had been turned on and off intermittently to expel water from the main. Otherwise it had been on since 11 o'clock a. m. When the gas company itself turned on the gas on June 25, the meter showed 12,000 cubic feet of gas had gone through it. The meter had been installed May 14.

With respect to the cause of the explosion, Dr. Frank Fowler, a consulting chemical engineer, testified as follows: He examined the wreckage on the day following the explosion. He testified the explosion originated in the space between the floor of the second floor and the ceiling of the first floor. "It was in that area that separated the two, where the ceiling joists of the first floor was involved, the explosion was in that space," he said. Dr. Fowler pointed out that the ceiling sheet rock had been blown downward and the second floor boards had been blown upward with great force. He further testified that the gas lines in the vicinity of the blast were defective. An elbow had a small hole from which gas could escape at the rate of 6.8 cubic feet per hour. A pipe had been cross-threaded to permit a leakage of 46 cubic feet per hour, and a nearby plug was also loose which would allow some leakage. These could have leaked in the space of two hours sufficient gas to cause an explosion of the magnitude of the one in question. He further stated that the defects in the lines could not have been caused by the explosion and that lacquer fumes—an alternate cause suggested by defendant—could not have caused the explosion. Dr. Fowler testified: "My opinion is that the natural gas in that ceiling area caused the explosion, was ignited and caused the explosion. . . . The basis of that opinion is the evidence that I saw of the damage, the location of the origin of the explosion, the way the floor was blown up into the ceiling and the ceiling was blown downwards, indicating the explosion occurred in that area. The only possible fuel that was in that ceiling area was natural gas. . . . The only fuel that was in that area was the gas lines, the natural gas lines, and that offered the only possibility of fuel in that ceiling area. This was a vapor-air type of explosion. . . . The lacquer could not have gotten into that ceiling area in any concentration that was detectable, that would have caused an explosion. . . ."

This evidence is sufficient to show prima facie that gas was present and caused the explosion. The absence of direct evidence of the open gas cock is not fatal. The ultimate contested fact to be believed by the jury was that the explosion was caused by the presence of natural gas. They were entitled to believe that fact from the testimony of Dr. Fowler as to the characteristics and the location of the blast. The jury was not concluded by the direct evidence respecting the position of the gas cock control. They could believe as a matter of deductive logic, as a necessary corollary to the presence of natural gas at the blast location, that the gas cock was on for some period during the afternoon. *Coffman v. St. Louis-San Francisco Ry. Co.*, 378 S.W.2d 583, 599 (Mo.1964).

Defendants for their position cite *Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. Metal-Matic, Inc.*, 323 F.2d 903 (8th Cir. 1963), where plaintiff sought damages from the railroad to machinery in transit. Its evidence consisted of an expert's testimony that the damage to the machinery was of the sort which would occur if cars containing the machinery were to strike with unnecessary impact during switching or other movements. That of course was found by the court to be entirely too speculative to prove the railroad's negligence, particularly in view of other equally plausible explanations for the damage. The case is not analogous to the one now before us.

Defendant also cites several cases of which *Craddock v. Greenberg Mercantile,* 297 S.W.2d 541 (Mo.1957) is an example. Such cases hold that proof cannot consist of "inference piled upon inference." An inference must be based upon the solid footing of a proven fact. Unless it rests upon such a foundation, it is a house built upon the sand. Such cases in one way or another apply Professor Wigmore's statement, 2 Wigmore on Evidence § 659(c) (1940), " . . . The law may reject testimony which appears to be founded on data so scanty that the witness' alleged inference from them may at once be pronounced absurd or extreme." But that is not the present case. The fact of the presence of natural gas at the explosion center is rather substantially supported by the evidence.

We conclude that the evidence is sufficient to show prima facie, and the jury was entitled to believe, that natural gas was present and caused the explosion.

*Admission of test results.*

Defendant says Dr. Fowler's tests upon the gas pipes and fittings, which revealed the leaks, were inadmissible because there was no showing that the gas pipes and fittings were in the same condition when the tests were made as when the explosion occurred.

Dr. Fowler went to the site on the day after the explosion. The gas line itself, he said, had not been disturbed or broken by the explosion. He said further that when he returned five days later the pipe was in the same condition as when he had earlier observed it. On the second occasion he introduced freon into the line. The line "would not hold pressure at all. . . . There were a number of leaks in the system." Leaks were located by the use of soapsuds, which would form a bubble where gas was escaping. A small hole was discovered in an elbow. At another point there was a loose plug. Another pipe had been cross-threaded so as to cause a leak. The defective pipes were removed and tested. The leakage at the point of the cross-threading was 46 cubic feet an hour. At that rate, in two hours there would be a 10

percent mixture with air which would cause a violent explosion. The small hole in the elbow would allow the loss of 6.8 cubic feet of gas per hour. The test procedures were described by the witness.

We are satisfied the results of the freon gas tests were admissible. There is of course no way exactly to reconstruct conditions as they existed at the instant before or at the instant of the explosion. It is sufficient for admissibility of such tests that *salient conditions* be substantially similar. *Klaesener v. Schnucks Markets, Inc.,* 498 S.W.2d 555, 558–9 (Mo.1973); *Faught v. Washam,* 329 S.W.2d 588, 598 (Mo.1959).

In the admission or exclusion of test results, a certain discretionary latitude is allowed to the trial judge. The ultimate test of admissibility is whether the test results will be of aid to the jury in deciding the issues of the case. The results of the tests having been admitted into evidence, they may be exposed to cross-examination and any supposed dissimilar conditions examined. The value of the test results is then for the jury to assess. The jury is quite competent to evaluate the tests, the more so when their subjects are no more esoteric than the escape of natural gas through holes in pipes and imperfectly joined fittings. *Ward v. Penn Mutual Life Insurance Co.,* 352 S.W.2d 413, 425–6 (Mo. App.1961).

The admission into evidence of the tests upon the gas pipes was entirely correct.

Dr. Fowler also testified to tests made upon lacquer fumes resulting from lacquer spraying. Defendant as earlier noted, had suggested that such fumes, rather than escaped natural gas, had fueled the explosion. Dr. Fowler was permitted to testify to his attempts to ignite various concentrations of lacquer fumes, under various conditions. Defendant points out dissimilarities in conditions at the time of the explosion and the test conditions. The principles noted above in connection with the gas pipe tests are applicable here, and would allow the admission of these tests also. There is an additional point: Each

point of difference pointed out by appellant was on the side of higher concentrations of lacquer fumes and otherwise more volatile conditions than would have existed with the spraying operations of the painters at the time of the explosion. *See: Biener v. St. Louis Public Service Co.,* 160 S.W.2d 780, 783 (Mo.App.1942); *State Forester v. Umpqua River Navigation Co.,* 258 Or. 10, 478 P.2d 631 (1970); McCormick on Evidence § 202 (1972). The defendant was not prejudiced by the dissimilarity of conditions, and the defendant on cross-examination did not inquire into them.

This point must be ruled against appellant.

*Expert's reference in testimony to scientific literature.*

Defendant complains of the following testimony of Dr. Fred Kurata:

"Q. Dr. Kurata, are you aware of any report in the literature of any human being exposed to 12,000 parts per million and living to tell about it? . . .

"A. No, I'm not aware of anybody surviving that exposure."

Defendant's complaint about this testimony is that it was based upon literature and was therefore hearsay.

█ The witness, a professor of chemical and petroleum engineering at the University of Kansas, had testified that 4,000 parts per million of the lacquer solvent to one million parts air would cause narcosis in a person. He did not say how long that would take, but he did say that a 12,000-parts-per-million mixture would cause a person to be ill in a matter of minutes—and that a minimum explosive concentration would be 12,000 parts per million.

Certainly a scientist, who depends for much of his expertise upon what he reads in the literature in his field of expertise, may testify to knowledge gained therefrom—the more so in this instance since his testimony was what the literature did not report, i. e., any case of a person's surviving exposure to a given concentration of lacquer solvent vapors. *State v. Baldwin,* 36 Kan. 1, 12 P.

318, 326–7 (1886); 31 Am.Jur.2d *Expert and Opinion Evidence* § 66 (1967); 32 C.J.S. *Evidence* § 573 (1964).

*Opinion evidence of expert.*

Dr. Kurata also testified to his opinion that the explosion was the result of natural gas, and not of lacquer solvent fumes. For this testimony defendant says there was no sufficient factual foundation. Dr. Kurata's opinion evidence is attacked by appellant on a wide front.

The objection to the hypothetical question was on the single ground that "the question omits essential facts. There was no evidence the gas cock had ever been open."

█ The hypothetical question had made no reference to the condition of the gas cock. We have already dealt with that subject under another topic, and hold it was not necessary to include in the hypothetical question any reference to the gas cock. A party may frame his hypothetical question to state facts in accordance with his theory. *Schmitt v. Pierce,* 344 S.W.2d 120, 130 (Mo. banc 1961). Of course, the hypothetical facts must have support in the evidence. *Schears v. Missouri Pacific Railroad Co.,* 355 S.W.2d 314, 321–322 (Mo. banc. 1962).

Dr. Kurata said that, besides the hypothesized facts included in the question, he took into account that one of the painters "says he saw a flame . . . near the ceiling of this apartment." This information he had gained from reading the painter's deposition.

The witness said also that he had taken into account that leaks were discovered in the gas pipes. Appellant correctly points out that this factor was not included in the hypothetical question, and says that fact was therefore "hearsay" as to Dr. Kurata and invalidates his opinion. The reader will remember that Dr. Fowler had testified to the leaks in the gas pipes, so that fact was in evidence.

█ That the facts upon which the expert based his opinion were not included in the hypothetical question is of no conse-

quence at all and does not weaken or invalidate his opinion. The point is to get before a court and jury the actual facts upon which the opinion is based, it matters not how the facts were brought to the expert's knowledge. Then it can be determined whether the opinion is based upon correct data—that is, data supported by the evidence, and further whether the data logically supports the expert's opinion. The court is then able initially to decide the admissibility of the opinion, and the jury is equipped to assess its value. *Sneed v. Goldsmith,* 343 S.W.2d 345, 351 (Mo.App. 1961). Both the fact of the flame across the ceiling and the fact of the leaking gas pipes were in evidence. It was proper for the expert to consider them in forming his opinion, though he had gotten the information from some source besides the hypothetical question or personal observation.

■ Later, the witness testified that lacquer solvent vapors would explode at a minimum concentration of 12,000 parts per million parts of air, while "if you have 800 parts per million, anybody who is exposed to that becomes uncomfortable in a short period of time. My evidence showed that not one of the painters complained of feeling ill from the inhalation of the solvent vapors, so that is another indication the concentration of solvent vapors was well below the explosive limits, lower explosive limits." No objection was made at the time but afterwards, during cross-examination, the statement about none of the painters' becoming ill was stricken by the court. Still later, on redirect examination, the witness was asked if his opinion would be changed "if he had no evidence one way or the other whether or not they got ill." He replied that his opinion would be unchanged. Any error was thus rectified. *Sneed v. Goldsmith, supra* at 352.

Dr. Kurata said on cross-examination he had based his opinion in part on testimony in some of the depositions. The defendant complains this was "unspecified" testimony. However, we believe from the witness's earlier direct testimony that he was referring to the two facts previously considered, namely, the flame across the ceiling, and that none of the painters had become ill from inhalation of lacquer fumes before the explosion. It was so assumed by the trial judge and the record gives us no reason to think otherwise.

The witness also took into account, he said, calculations which he had made from information furnished by plaintiff, and appellant complains we do not know what that information was. The witness testified, however, both upon direct and cross-examination, to a mass of information upon which his calculations were based. There is no reason to believe that the information which he had used was other than that to which he specifically referred in his testimony. Appellant does not point us to any of the information which was not supported by evidence in the case.

We find no error in admitting the opinion testimony of Dr. Kurata.

"We recognize the law to be, that a sound discretion be exercised by a trial judge over the subject matter covered in a hypothetical question. . . . Also, that upon objection to such a question, a trial court may, if it so desires, require counsel to supply additional facts if the question is framed inadequately; and some courts hold that no error is committed where the question is allowed as framed since the opposing counsel, on cross-examination, may supply whatever additional facts he feels will have a bearing on the expert's opinion. . . . Failure to frame a question which has as its basis all the disputed or material facts in evidence does not always make that question improper. . . . (Citations omitted)." *Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. Metal-Matic, Inc., supra.*

*Defense of collateral estoppel.*

Defendant claims the court erred in denying its defense of collateral estoppel as against subrogee Employers Insurance Company of Wausau, to the extent of $20,011 workmen's compensation benefits paid by it for the death of Ernest Salsberry.

Employers Mutual of Wausau was the workmen's compensation insurance carrier

for Barker Painting Company who was the painting subcontractor on the East Side Apartments project and the employer at the time of the explosion both of plaintiffs' decedent, Salsberry, and of Jack Forson. Employers Mutual paid workmen's compensation benefits for both employees, to Forson for injuries sustained in the blast and to decedent Salsberry's dependents. Forson filed suit against Archibald for damages for negligence in allowing the escape of gas, as a result of which the explosion occurred and Forson was injured.

Employers Mutual was interested in the Forson action as a subrogee to the extent of its workmen's compensation payments to him. § 287.150, RSMo 1978.

That suit was tried and resulted in a verdict for defendant Archibald.

Archibald claims now that since the verdict in the Forson case went against Forson, and for Archibald, that Employers Mutual—to the extent of their workmen's compensation to the respective plaintiffs—is foreclosed by collateral estoppel from asserting a second time in the present case that Archibald negligently allowed the escape of gas. Archibald claims that Employers Mutual was a "silent plaintiff" and exercising control in both cases. It says that the issue of Archibald's negligence was litigated in the Forson case and Employers Mutual should not be permitted to litigate it again. Archibald does not claim, of course, that the widow and children of the decedent are estopped to allege and prove their case against defendant.

■ Upon the record before us we are unable to reach the broader questions presented by this point. We cannot tell whether the issues of the Forson trial were identical to those in the present trial. We have the Forson petition and the Archibald answer to that petition. The Archibald answer alleges Forson's contributory negligence as a defense. If there was evidence of Forson's contributory negligence in the Forson trial and that issue was submitted to the jury, the jury's verdict for defendant would not necessarily acquit Archibald of negligence. The jury may have believed Archibald guilty of negligence, but have believed that Forson was contributorily negligent. The transcript contains only the petition and answer in the Forson case, and the stipulation that the verdict went for defendant Archibald. It is certain that collateral estoppel forecloses a party from litigating an issue only if that exact issue was unambiguously decided in the earlier case. *Oates v. Safeco Insurance Company of America*, 583 S.W.2d 713 (Mo. banc 1979); *Kansas City v. Graybar Electric Co., Inc.*, 485 S.W.2d 38, 43 (Mo. banc 1972).

■ The present record does not show the Forson case to have decided that Archibald's negligence did not cause the fatal explosion. The verdict in that case does not furnish a basis for a defense of collateral estoppel. The point is disallowed.

*Review of alleged error in excluding testimony when no offer of proof made.*

■ Defendant offered the testimony of one Alfred Benberg, described as an expert witness who had testified on behalf of defendant Archibald in another case growing out of the same explosion, and who had since died. The exclusion of this evidence is assigned as error.

.No tender of any transcript was made at trial, nor is any transcript of Benberg's testimony included in the transcript on appeal. In the absence of a proper preservation of the point, we are unable to tell what the Benberg testimony would have been, hence whether its exclusion was prejudicial error. *Elliott v. Richter*, 496 S.W.2d 860, 864 (Mo.1973); *Barnett v. Scholz*, 496 S.W.2d 812, 814 (Mo.1973). The point must be ruled against the appellant.

*Gratuitous addition of phrase to MAI form-of-verdict instruction.*

■ Defendant challenges the form-of-verdict instruction "because the instruction was an unwarranted modification of 36.01 in that the second form of verdict unnecessarily added the words 'and against the plaintiffs.'"

The form-of-verdict instruction told the jury that if they agreed upon a verdict in

favor of the defendant *"and against the plaintiffs,"* it might be in the following form: "We, the jury, find the issues in favor of the defendant *and against the plaintiffs."*

It will be seen that the phrase "and against the plaintiffs" is here added in two places to MAI 36.01. It should have been omitted in both. Defendant, arguing that these additions were purposeful and prejudicial, says in effect that the jury would shrink from adopting the language "against the plaintiffs" when the plaintiffs were a widow (albeit remarried) and nine minor children, and that the harshness lent to the language by the addition of the phrase repulsed the jury from the use of the defendant's verdict form.

Gratuitous modifications of MAI instructions, no matter how minor, are pesky, and risky. If a party can insinuate into an instruction some sly argument, to give his case some real or fancied advantage, the temptation will be too attractive to resist. The salutary purposes of the MAI system will soon be eroded, a point of view expounded in *Brown v. St. Louis Public Service Co.,* 421 S.W.2d 255, 258 (Mo. banc 1967). On the other hand, certain minor changes have been held not to be reversible when they have been so insubstantial that the court may determine it was not prejudicial. *Offenbacker v. Sodowsky,* 499 S.W.2d 421, 424 (Mo.1973); Rule 70.02(c). As to this change now under consideration, it is certainly not one of substance. We cannot imagine that it influenced the outcome of this case in the slightest degree. The instruction, after all, comes into play only after the jury has decided the issues. It deals with the form of the jury's report to the court. We find the error—as error it was, Rule 70.02(c)—not to have been prejudicial, and appellant's point is disallowed.

*Erroneous sequence of MAI 2.02.*

Appellant complains that MAI 2.02 "facts not assumed" was given immediately following the burden of proof instruction and immediately before the verdict-directing instruction.

Appellant correctly says that giving the instruction in this location was error. The "notes on use" to MAI 2.02 enjoin us to give the instruction immediately before the form-of-verdict instruction. While the "notes on use" are authoritative, and although any deviation is error and presumed to be prejudicial, *Doyle v. St. Louis-San Francisco Railway Company,* 571 S.W.2d 717, 724 (Mo.App.1978), still the court must inquire in each case whether the deviation is in fact prejudicial. In this case, we have concluded that the erroneous placement of MAI 2.02 was not so.

Defendant cites *Crystal Tire Company v. Home Service Oil Company,* 525 S.W.2d 317 (Mo. banc 1975), for its position that the wrong sequence of MAI 2.02 is reversible error, but that case is distinguishable. A critical consideration in the *Crystal Tire Company* decision was the complexity of the case and the number of the instructions. There were in that case 23 instructions and MAI 2.02 was given second. There were two defendants in the case who had filed cross-claims in two counts against each other, so there were a variety of possible verdicts.

In the present case, on the other hand, there were only eight instructions, and only two possible verdicts—for plaintiffs or for defendant—and MAI 2.02 was given as instruction No. 3. We are unable to see that any prejudice resulted to the defendant because of the improper sequence of the instruction. The case is ruled by *Doyle v. St. Louis-San Francisco Railway Company, supra.*

*Withdrawal instruction on remarriage of decedent's widow.*

Plaintiff widow of the decedent had remarried at the time of the trial. The court gave the following instruction at the close of the case, along with the other instructions:

"The plaintiff, Ann E. Salsberry, has remarried and her present name is Conroy. You are instructed that the fact of plaintiff's remarriage is to play no role in your determination of the pecuniary advantage which would have resulted from a continuance of the life of the deceased."

The giving of this instruction is claimed by defendant to be error. We will examine the instruction as against the criticisms contained in the motion for new trial, although the brief undertakes to attack the instruction upon the additional ground that "there is no provision in MAI for giving such an instruction." *Belter v. Crouch Bros., Inc.,* 554 S.W.2d 562 (Mo.App.1977). Also, grounds contained in the motion for a new trial and not carried forward in the brief are abandoned and will not be considered. *Holt v. Myers,* 494 S.W.2d 430, 440–441 (Mo.App.1973).

The instruction was suggested by this court, albeit in dicta, by way of a sort of advisory addendum, in *Glick v. Allstate Insurance Company,* 435 S.W.2d 17 (Mo.App. 1968). Defendant says, though, that that case requires the instruction to be given at the beginning of the case, if at all. The language to which defendant refers, which includes the suggestion that the instruction be given at the beginning of the case, is lifted from a New Jersey case. New Jersey's trial procedure is or may be different from our own. It would be somewhat awkward under our procedure to read this instruction at the beginning of the case when "the pecuniary advantage which would have resulted from a continuance of the life of the deceased" would have no meaning to the jury. Better to have given it with the other instructions, if it was to be given. At that point the language, taken in connection with the other instructions, would have some meaning to them.

The defendant says the instruction assumes a disputed fact, namely, that a pecuniary advantage would have resulted from a continuance of the life of the deceased. But there is no real dispute over that fact. *Weisman v. Herschend Enterprises, Inc.,* 509 S.W.2d 32, 37–38 (Mo.1974). The testimony was uncontradicted and unchallenged that the decedent at the time of his death was the sole support of his wife and nine of their ten children. He was a painter earning $186 per week and in 1969 earned $5,000.

We find no prejudicial error and this point is ruled against the appellant.

What we have said in holding this instruction not to be prejudicial error in this case, should not be considered an approval of the instruction for general use. It has not been suggested, and we have not considered whether MAI 34.02 might be the only appropriate instruction to withdraw from the jury's consideration the fact of plaintiff widow's remarriage. *In re Duren,* 355 Mo. 1222, 200 S.W.2d 343, 344–346 (Mo. banc 1947); *Rasco v. Rasco,* 447 S.W.2d 10, 15–16 (Mo.App.1969); *Vinyard v. Vinyard Funeral Home, Inc.,* 435 S.W.2d 392, 395–396 (Mo.App.1968).

*Omission of verdict director to require finding of manner of death.*

■■■ Next defendant attacks Instruction No. 4, because the instruction failed to require a finding "that the explosion was caused by the ignition of natural gas."

Instruction No. 4 reads as follows:

"Your verdict must be for plaintiffs if you believe:

"First, plaintiffs were the spouse and children of Ernest E. Salsberry, and

"Second, defendant caused or permitted natural gas to escape from the natural gas pipes into Building No. 9, and

"Third, defendant was thereby negligent, and

"Fourth, as a direct result of such negligence, Ernest E. Salsberry died."

Defendant argues that since the question whether the explosion was caused by natural gas, or, as defendant contended, by lacquer fumes, was a central issue in the case, that plaintiff's verdict director should have included a specific finding that the explosion was caused by natural gas.

The case of *Gathright v. Pendegraft,* 433 S.W.2d 299 (Mo.1968), rules this issue adversely to defendant's position. *Gathright,* like the present case, was one in which the plaintiff's decedent died as the result of an explosion. The plaintiff claimed that the explosion was caused by an accumulation of natural gas. The defendant denied it, but offered no alternative in explanation for the explosion. Defendant says the latter

point distinguishes that case from the present case, for here defendant undertook to prove that the explosion was caused by an accumulation of lacquer fumes rather than by natural gas. However, that is not a valid distinction, for both in the *Gathright* case and in the present case the jury was required to find that an admitted explosion was caused by natural gas.

The instruction does require the jury to find that the defendant had caused or permitted natural gas to escape from the natural gas pipes into Building No. 9; that it was thereby negligent; and that as a direct result of such negligence, the decedent died. Thus the instruction requires the jury to find from the evidence an unbroken track leading from defendant's negligence to decedent's death. If the jury found the facts *required to be found by that instruction,* i. e., that the decedent's death resulted from the defendant's causing or permitting the escape of natural gas, then they must necessarily have found that there was an explosion. There was no controversy whatever that it was an explosion which caused the decedent's death. Nobody contended, for instance, that he died by asphyxiation.

A review of the MAI verdict-directing instructions shows a pattern of omitting that intermediate link between the defendant's negligent act and the resultant injury, i. e., the *manner* of the injury. For example, in automobile accident verdict-directing instruction, MAI 17.01, the fact of the collision is omitted. The jury is required to find the conduct of the defendant, that the conduct was negligent, and that the negligence *resulted in plaintiff's injury,* omitting the fact of a collision.

There was no error in the verdict-directing instruction.

*Conclusion.*

Having examined all of appellant's points, and finding no prejudicial error, we affirm the judgment for plaintiffs.