Ralph BOYER, Respondent,

v.

EMPIREGAS, INC. OF CHILLICOTHE,
and Empire, Inc., Appellants.

No. WD 38275.

Missouri Court of Appeals,
Western District.

May 5, 1987.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 30, 1987.

Application to Transfer Denied
Sept. 15, 1987.

Morton, Reed & Counts, James H. Counts, Creath S. Thorne, St. Joseph, for appellants.

Ronald M. Sokol, St. Joseph, for respondent.

Before PRITCHARD, P.J., and MANFORD and BERREY, JJ.

BERREY, Judge.

Ralph Boyer brought this action against appellant Empiregas, Inc. of Chillicothe, (hereinafter Empiregas) and appellant Empire, Inc., for personal injuries resulting from a gas explosion which occurred when he attempted to light a gas furnace. On a jury verdict, Boyer was awarded $100,000 in actual damages against Empire, Inc. and Empiregas and $500,000 in punitive damages against Empire, Inc.; no punitive damages were assessed against Empiregas. Empire, Inc. and Empiregas appeal the judgment rendered on this verdict.

Ralph Boyer lived with his girlfriend, Lyda Mae Planck, who owned a two-story house located five miles north of Chillicothe on Missouri Highway 65. The house was heated by a gas furnace located in the basement. The furnace was fueled by liquified propane (LP) gas which was stored in a 500 gallon fuel tank located outside the house. The LP gas fuel was supplied by Empiregas, a retail distributor, and a wholly owned subsidiary of Empire, Inc., a wholesaler of the fuel.

Propane exists in a gaseous or liquid state and is colorless and odorless. When used as fuel, it is mixed with a chemical agent mercaptan so that it is odorized or "stenched." The stenching process for the gas delivered to the Planck home took place at the Mid-American Pipeline Company's (MAPC) distribution terminal located at Kearney, Missouri. Mercaptan is automatically injected into the propane as it is being loaded into transport tanker trucks which deliver the gas to the retail outlets. James Hartell, manager for MAPC, stated that if an injection of mercaptan is not made every twelve seconds, the loading process will cease. In certain circumstances, unodorized propane may by-pass the stenching process but an employee from Mid-American Pipeline must do it manually.

The fuel load in question was delivered by Jerry George, a driver for Cyrus Truck Lines, on September 28, 1980. He delivered some 9,500 gallons of LP gas to two bulk tanks owned by Empiregas located in Chillicothe. The delivery ticket for the load of propane received by Empiregas showed 1.53 pounds of mercaptan were injected into the load; this ticket is automatically stamped by the mercaptan meter at the loading site. No employee of Empiregas had the responsibility of determining whether the LP gas loads were odorized. The Cyrus truck driver had no specific memory that he smelled the odorant in question.

On October 7, 1980, John Isaacs, an employee of Empiregas, delivered the LP gas on the order of Lyda Mae Planck. Upon arrival to the Planck residence, Isaacs found the 500 gallon tank empty. He connected the hose from his delivery truck to the propane tank and turned on the valve and filled the tank to 87% capacity or 440 gallons. After the tank was filled, Isaacs took the delivery ticket to Mrs. Planck and she asked him to light the furnace. Isaacs agreed to light it as Empiregas provides this courtesy service when requested. He got some matches from his truck and proceeded to the basement. There he turned on the gas valve to the pilot and depressed a button to allow the gas to go through the pilot. As he did this, he held a lighted match over the pilot to ignite the furnace; however, the pilot would not light. He did this process several times without success.

Isaacs then sent Joe Ross, a temporary employee who was with him on this delivery, to get a crescent wrench and a pipe wrench from the truck. Isaacs loosened the joint going into the gas valve of the service line at its entry into the furnace heat chamber in order to "bleed the line." He listened and smelled for escaping LP gas but never heard or smelled anything. He checked the main gas delivery valve to see if it was open. He then retightened the connection and again tried to light the pilot several times but nothing happened. He did not check or test the retightened joint for leaks after he bled the line.

Isaacs left the basement and knocked on Mrs. Planck's door and told her he could not get the pilot to ignite. He stated he thought something was wrong with the furnace and he would send a serviceman, Nolan Long, out the next day. He testified he warned her to leave it alone. Isaacs then left and went back to the office in Chillicothe where, upon arrival, was told something had happened at the Planck home.

While Isaacs had been trying to light the furnace, Ralph Boyer was in bed upstairs. He heard some conversation downstairs but it was inaudible. About the time Isaacs had left Boyer got up and got dressed. He put on slacks, a short sleeve shirt and his shoes and socks. After he had a cup of coffee, Boyer went to the basement to light the furnace. Boyer had worked in retail sales of LP gas and appliances, and was familiar with the process of lighting gas furnaces. Boyer testified he went down to the basement with a flashlight and a Bic disposable cigarette lighter. He went over, reached down to push the pilot button and flipped the cigarette lighter. He testified he saw a fire ball come at him from the southeast corner of the basement and knocked him down. He stated the next thing he knew he was on the basement floor and that he had been burned. He sustained burns of the radial and anterior aspect of both forearms, part of both upper arms, both hands and the anterior aspect of both legs; the burns were classified as second and third degree burns.

Isaacs returned to the Planck house after learning of the explosion [1] and, put out some flames burning six to eight inches high. He saw the glass basement door had broken but that the furnace was undamaged. A deputy sheriff turned off the valve from the fuel tank. Isaacs showed the deputy sheriff that he had not left the gas line loose in the basement; he took some pliers and worked the fitting to show the line was tight.

Nolan Long, an assistant regional manager of Empire, Inc., the parent corporation, also went to the Planck house after learning of the incident and found evidence of fire and smelled smoke. Nolan noticed the furnace was intact and had cobwebs on the inside. He stated the front and rear doors to the basement were smashed.

The deposition of Wayne Cunningham, a Chillicothe plumber, was read into evidence; he testified that when there is an internal explosion within the furnace, the furnace will reveal a bulging shape. He stated nothing like that was observed at the Planck home. He testified that in October of 1980, sometime after the explosion, he replaced a rusted pilot light assembly which prevented the pilot from being ignited because no gas could pass through the opening; however, Ron Butts, a former employee of Cunningham, stated he did not remember replacing the assembly or having trouble lighting the furnace. Mr. Cunningham further testified that the National Fire Protection Code requires leak testing of a gas system after its seal is broken to bleed a line and that bleeding a line, as in the Planck home, is accomplished in a matter of seconds.

Much of the testimony presented at trial revolved around the defendants' corporate structure. The evidence revealed Empire, Inc. owned approximately 280 retail distribution outlets like Empiregas which pur-

---

1. Upon returning to the office at Empiregas, John Isaacs was told by the receptionist that "something had happened at the Planck house." He then made the twenty minute drive back to the Planck house.

chased LP gas from Empire, Inc., a wholesaler of the fuel. Empire, Inc. owns 100% of the stock of Empiregas and, in 1980, selected all of the directors of the Chillicothe subsidiary. In 1980, Empire, Inc. and Empiregas had four common officers.[2] The corporate records of this retail distributor are maintained by the parent company. Nolan Long, the retail manager of Empiregas, testified his supervisor was Jasper Norman, a regional manager at Empire, Inc. Nolan Long testified that all accounts payable were forwarded to the parent company for payment and Darrell Kays, an employee of Empire, Inc. testified that all disbursements were made from Empire, Inc.

Nolan Long acknowledged that he received his training on the manufacture, transmission and delivery of LP gas through Empire, Inc., the parent company. He studied the properties and uses of LP gas and also received managerial training. Earl Noe, vice-president of Empire, Inc., stated Empire, Inc. had prepared a safety manual which was distributed to the subsidiaries. He indicated it was the responsibility of the retail managers to see each employee was properly instructed in the safe handling of LP gas and LP gas equipment, and to conduct safety meetings for the employees.

Mr. Isaacs, the delivery man of the Planck LP gas, received on-the-job training for a two week period; this consisted of Nolan Long riding with him and showing him how to do the job and discussing safety aspects of home LP gas delivery. He never received any formal instruction and although he had been provided literature, he did not know if he had been provided an employee's manual or if the literature he received pertained to gas delivery. Isaacs did not know whether there was a file of the literature at the retail office.

This case was submitted to the jury on the theories of strict liability for providing defective gas and negligence for failure to odorize the gas or to properly train John

Isaacs with respect to Empiregas. As to Empire, Inc., plaintiff submitted his case on the theory of negligence for failure to train John Isaacs. The jury returned a verdict against both defendants for $100,000 in actual damages. The jury awarded $500,000 in punitive against Empire, Inc., but no punitive damages were assessed against Empiregas.

### I.

■ Appellants, Empire, Inc. and Empiregas assert in their first point on appeal instructional error on the sole verdict director as to Empire, Inc.:

### INSTRUCTION NO. *12*

Your verdict must be for plaintiff Ralph Boyer and against defendant Empire, Inc. if you believe:

First defendant Empire, Inc. failed to properly or adequately train the employees of Empiregas, Inc. of Chillicothe in safe delivery procedures of propane; and

Second, that at the time of delivery of the propane to the house occupied by plaintiff Ralph Boyer, defendant Empire, Inc. had the duty to train the employees of Empiregas, Inc. of Chillicothe in safe delivery procedures of propane gas, and

Third, John Paul Isaacs caused or allowed propane gas to escape into the home occupied by plaintiff Ralph Boyer and failed to warn plaintiff of its presence; and

Fourth, defendant Empire, Inc. was thereby negligent; and

Fifty, that as a direct result of such negligence, alone or combined with the acts or omissions of defendant Empiregas, Inc. of Chillicothe, plaintiff was damaged.

It is asserted the jury was not instructed as to *any* theory whereby *Empire, Inc.*, as a parent company, could be found responsible for the actions of its subsidiary, Empiregas, and the verdict director erroneous-

---

**2.** In 1980, Loren Keen was vice-president of Empire, Inc. and president of Empiregas. Paul Linsey was the financial vice-president of Empire, Inc. and vice-president of Empiregas. Willis Green was the secretary of Empire, Inc. and corporate secretary of Empiregas. Ernie Campbell was the treasurer and assistant secretary of Empire, Inc. and treasurer of Empiregas.

ly only required the jury to determine the "ultimate fact question" of whether "defendant had the duty to train the employees of Empiregas." Appellants argue no agency instruction was submitted to the jury or that plaintiff failed to demonstrate the corporate structure should be disregarded because (1) there was no evidence the corporate form was used as a tool to promote fraud, injustice or illegality; *Smith v. City of Lee's Summit,* 450 S.W.2d 485, 489 (Mo.App.1970); and (2) its existence was used to "defeat public convenience, to justify wrong or to perpetuate fraud." *Fairbanks v. Chambers,* 665 S.W.2d 33, 37 (Mo.App.1984).

Plaintiff maintains proof of agency or the existence of a corporate shell is unnecessary as his case is based on the theory of direct liability as presented in Restatement of Torts § 324(A): [3]

§ 324A. Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Plaintiff argues his position throughout the trial was that the parent company, Empire, Inc., had assumed the duty of training and supervising the employees of Empiregas on safety matters; that Nolan Long, the manager of Empiregas, was trained solely by employees of Empire on LP gas safety; that Long reported to Empire, Inc.

on all safety matters; and that safety training standards were established and controlled by the parent corporation. Plaintiff relies on *Hoover's Dairy, Inc. v. Mid American Dairymen,* 700 S.W.2d 426, 432 (Mo. banc 1985), for support of his submitted instruction. In *Hoover's Dairy,* plaintiff sought damages for the loss of 76 cows due to the negligence, in part, of Dairy Equipment International Incorporated (DEC), the manufacturer of automatic milking system who had contracted Mid-America Dairy to act as distributor of the systems; there was evidence that DEC, as part of the distributorship arrangement, was to provide Mid-America training in sales and service procedures. Hoover's Dairy had alleged DEC's failure to adequately train the employees resulted in a problem in the installation of the milking system which caused the cows to contract a bacterial infection causing their death. *Id.,* at 429–430. The instruction approved of in *Hoover's Dairy,* based on § 323, a parallel section to § 324A, *see* footnote 3, *supra,* stated:

Your verdict must be for plaintiff against defendant DEC International Inc. if you believe:

First, defendant DEC International, Inc. undertook to train and supervise Mid-American Dairymen, Inc./Special Products, Inc., in the proper installation of the system, and

Second, defendant DEC International Inc. permitted installation of the system without a test for stray voltage, and

Third, defendant DEC International Inc. was thereby negligent, and

Fourth, such negligence either directly caused damage to plaintiff or combined with the acts of defendant Mid-American Dairymen, Inc./Special Products, Inc. to directly cause damage to plaintiff.

*Id.,* at 430–431.

Plaintiff asserts that Instruction No. 12 primarily establishes the elements of liability under § 324(A) although the first two elements of the instructions are in reverse

---

**3.** "This rule stated in this Section parallels the one stated in § 323, as to the liability of the action to the one to whom he has undertaken to render services. This section deals with the liability to third persons." Restatement (Second) of Torts § 324A comment a.

order. We disagree. The first element in the instruction in *Hoover's Dairy* required the jury to find that defendant *"undertook to train and supervise* Mid American Dairymen...."* In this regard, the *Hoover's Dairy* court stated "A necessary predicate for establishing liability against DEC was that DEC *undertook* to train appellant Mid-American employees and supervise installation of the milking system." *Id.,* at 433 (emphasis supplied). This element is particularly crucial where, as here, the evidence is hotly disputed as to this issue; defendant Empire denies with fervor that it was directly involved with the subsidiary's safety measures. Therefore, Instruction No. 12 was prejudicial and erroneous.

### II.

■ Defendants also take exception to the submission of plaintiff's verdict director as to Empiregas as (1) being a "roving commission" as it failed to instruct the jury to find that the acts of Empiregas caused the release of propane gas (Point I); and (2) being improper and prejudicial as it incorrectly placed upon Empiregas a duty to odorize propane gas (Point IV).

Plaintiff's Instruction No. 10 submitted on a theory of negligence states:

Your verdict must be for plaintiff Ralph Boyer and against defendant Empiregas, Inc. of Chillicothe if you believe:

First either:

Defendant Empiregas, Inc. of Chillicothe failed to odorize the propane gas which is supplied sufficiently that a person with a normal sense of smell could detect the presence of the gas; or

Defendant Empiregas, Inc. of Chillicothe failed to properly or adequately train John Paul Isaacs in safe delivery procedures of propane; and

Second, that defendant Empiregas, Inc. of Chillicothe, through the acts or omissions of its employee John Paul Isaacs, allowed propane gas to escape into the home occupied by plaintiff Ralph Boyer and failed to warn plaintiff of its presence; and

Third, defendant Empiregas, Inc. of Chillicothe was thereby negligent; and

Fourth, that as a direct result of such negligence plaintiff was damaged.

Defendant first argues this instruction is "fatally defective in that it merely asked the jury in the second paragraph to find that "Isaacs allowed propane to escape" without requiring the jury to find Isaacs so acted *because of* Empiregas, Inc. of Chillicothe's failure to provide odorized gas or to adequately train." (Emphasis supplied.)

Plaintiff asserts the elements in Instruction No. 10 have been approved in *Salsberry v. Archibald Plumbing and Heating, Inc.,* 587 S.W.2d 907, 917 (Mo.App.1979) and *Gathright v. Pendegraft,* 433 S.W.2d 299, 310 (Mo.1968). In *Salsberry v. Archibald Plumbing and Heating Co. Inc., supra,* 587 S.W.2d at 917, the court approved of a verdict directing instruction requiring the jury to find (1) defendant caused or permitted natural gas to escape from natural gas pipes; and (2) that defendant was thereby negligent. The court found a finding of causation as to the explosion resulting from the escape of natural gas was not required. In this regard, the court stated, "If the jury found the facts required to be found by that instruction, i.e., that the decedent's death resulted from the defendant causing or permitting the escape of natural gas, then they must necessarily have found that there was an explosion." *Id.,* at 918. In *Gathright v. Pendegraft,* 433 S.W.2d 299, 310 (Mo.1968), the verdict directing instruction on negligence set forth the element of failing to odorize sufficiently so that a person with a normal sense of smell could detect the presence of gas. As in *Salsberry v. Archibald Plumbing and Heating Co. Inc., supra,* the *Gathright* court dealt with the issue of whether the instruction, in error, failed to require the jury to find the source of the explosion and fuel was natural gas. The *Gathright* court found there was no dispute nor was there any evidence that the plaintiff therein had sustained injury except as a result of the explosion and such a finding was necessarily implied from the required findings. *Gathright v. Pendegraft, supra,* 433 S.W.2d at 310. In Instruction No. 10 the lack of the element of causation alleged by

defendant is similarly not fatal to plaintiff's cause. Unlike the case above, however, the implicit finding of causation was not requested nor required. The plaintiff framed his negligence claim on the findings of both the lack of odorization (or lack of training) *and* the actions of John Isaacs. Plaintiff created a greater burden of proof for himself than seen in either *Gathright* or *Salsberry*. No prejudice existed toward the defendants.

■ Defendants also assert that this instruction, couched in the alternative, erroneously charges the jury to find Empire had a "duty to odorize propane gas." Defendants argue Empiregas, as a retailer or distributor, is not liable for the negligence, i.e., failure to odorize, relating to the manufacture of a product it sells, *see Hays v. Western Auto Supply Co.*, 405 S.W.2d 877, 882 (Mo.1966); it suggests if there is a duty, it exists only with respect to the inspection of the product which is not present in the case. In *Thompson v. Economy Hydro Gas Co.*, 363 Mo. 1115, 257 S.W.2d 669 (1953), a retailer of gas produced and purchased from another company similarly alleged it had no duty to artificially odorize the gas or make an inspection to determine if the gas had been stenched. The court found that the retailer can, as a matter of law, be held to have a duty to artificially odorize the gas or to see that it had been odorized. *Id.* 257 S.W.2d at 673. The court stated:

> We have been able to deduce and ascertain the rule that, in view of the highly dangerous character of the commodity, gas, being supplied or transported and because of its well-known tendency to escape and become an element not only entailing possible but probable death and disaster, the applicable principle is that a gas supplier should exercise the care and precautions proportionate to the danger.

*Id.* Other cases have likewise acknowledged that a distributor possesses this duty. *See Winkler v. Macon Gas Co.*, 361 Mo. 1017, 238 S.W.2d 386, 391 (1951), and cases cited therein. It is also noted that the duty to odorize LP gas in this state is set forth in 2 CSR 90–10.040, which adopts the provisions of NFPA standard as set forth in Manual No. 58, for the storage and handling liquidfied of petroleum gas. It states that "all LP–Gases shall be odorized by the addition of a warning agent of such character that they are detectable, by a distinct odor...." NFPA 58, *General Provisions*, 1300 at p. 58–13. Defendant Empiregas is registered "to engage in the business of selling at retail liquified petroleum gas," 2 CSR 90–10.012(1), and is required to conform to the published rules and regulations. *Page Western v. Community Fire Protection*, 636 S.W.2d 65, 68 (Mo. banc 1982). Thus, under the evidence before us, the trial court did not err in the submission of this instruction.

### III.

Defendants allege plaintiff failed to make a submissable case on the issue of strict liability for product defect; plaintiff's theory was that the propane gas sold to the Planck home was defective because it was not sufficiently odorized which eventually led to plaintiff's resulting injuries. Defendants assert the only evidence of insufficient odorized gas was negative evidence which has limited probative value.

In determining whether plaintiff has made a submissable case on this issue, as an alternative basis to support the verdict, this court must find substantial evidence, direct or circumstantial, in the record to support the verdict, *Zeigenbein v. Thornsberry*, 401 S.W.2d 389, 393 (Mo.1966), and this court must consider the evidence in the light most favorable to plaintiff. *Duke v. Gulf and Western Manufacturing Co.*, 660 S.W.2d 404, 409 (Mo.App.1983).

The evidence in the record bearing on defendant's [Empiregas] failure to supply "odorized" gas revolves around the testimony of plaintiff who stated that when he first went down to the basement to light the furnace, all he could smell was the musty basement. There was additional testimony from John Isaacs, the deliveryman, who testified he could not specifically remember smelling any odorant when he loaded the Planck storage tank. He stated he was familiar with the odor of mercaptan and that he had a normal sense of smell

but he denied ever smelling LP gas in the Planck basement. Isaacs testified that he "bled" the system between 5–7 seconds, long enough to let the gas escape, and he did not smell the odorant. He did not test for the presence of unodorized propane through a hydrocarbon detector or by doing a soap test; soap and water are applied to the joints to determine if gas is escaping.

■ Under certain circumstances, negative evidence, that the presence of gas was not detected by a person with an ordinary sense of smell may constitute probative evidence from which a jury can properly find a negative fact, that the gas was not sufficiently odorized. *Gaithright v. Pendegraft, supra,* 433 S.W.2d at 306; *Winkler v. Macon Gas Co., supra,* 238 S.W.2d at 390. In *Gaithright v. Pendegraft, supra,* 433 S.W.2d at 305–306, the court found such negative evidence constituted probative evidence where there was additionally no evidence or no written record of the quantity of the odorant used by the supplier of the gas. In *Winkler v. Macon Gas, supra,* 238 S.W.2d at 390, the court found the evidence therein, that ten or fifeen minutes after the explosion occurred soap tests were made for leaks and one witness testified she noticed some "blubbers" in the valve, supported the plaintiffs' testimony that they did not smell anything in the basement before the explosion.

■ Here, plaintiff's testimony is corroborated by the testimony of John Isaacs, an employee of defendant Empiregas, that no odorant was apparent when he was in the basement shortly before the explosion and fire occurred. There was additional testimony by Nolan Long, regional manager of Empire, who visited the Planck home after the accident to the effect that the furnace was intact and there were cobwebs on it. Wayne Cunningham, a Chillicothe plumber, testified the furnace revealed no internal explosion. He stated the furnace had a rusted pilot light and no gas could pass through the opening. He stated bleeding a line could be accomplished in a matter of seconds. Thus, the jury could draw the reasonable inference that a gas leak occurred through the line which had been bled and the failure of John Isaacs or plaintiff Boyer to smell the gas was due to an insufficient amount or effectiveness of the odorant. Therefore, this court believes proper circumstances exist in this case to find the negative evidence, that the gas was undetected by a person with an ordinary sense of smell, is probative evidence of the fact that the gas was not sufficiently odorized.

### IV.

Defendants allege the trial court erred in (1) admitting a color photograph of plaintiff lying in his hospital bed after the accident because of an insufficient foundation; and (2) admitting a bag of plaintiff's battered clothing on the basis there was an insufficient chain of custody.

■ Defendants complain there was *no* testimony that the picture was a true and accurate representation of plaintiff's condition after the accident; they complain Dr. John Seaburg, upon whose testimony the foundation rested was insufficient for its introduction. The pertinent portion of Dr. Bradley's testimony is as follows:

Question: Doctor, when you first saw Mr. Boyer, can you tell me if what is marked as Plaintiff's Exhibit 1 is a fair and accurate representation of the condition Mr. Boyer was in when you first observed him?

Answer: Okay.

Question: And I believe your prior testimony indicates you saw him that night?

Answer: That's correct.

Question: Can you tell us then, Doctor, if that photograph is a fair and accurate representation of his physical condition as far as the parts that are exposed that you can see in that photograph?

MR. JOHNSON: Objection.

Answer: The person in this photograph has facial characteristics that make me think this is indeed Ralph Boyer.

MR. SOKOL: Your Honor, at this time we offer plaintiff's Exhibit 1.

THE COURT: Okay. Would you come up?

(Counsel approached the bench and the following proceeding were had:)

MR. SOKOL: That would be the one we've already ruled. I submit, again, that it has been properly identified. There was not a lack of—There is a lack of proper foundation, that the prejudicial value of this photograph far outweighs any probative evidence whatsoever as it relates to this; and it simply does not have the proper foundation and background to be admitted.

THE COURT: Objection is overruled. What's this exhibit—What's the number it's been marked?

MR. SOKOL: It carries Trial Exhibit 1.

THE COURT: All right.

MR. SOKOL: We would offer Exhibit 1 and ask leave to examine—

THE COURT: Plaintiff's Exhibit 1 is received in evidence.

MR. SOKOL: And request leave—

THE COURT: You may pass it to the jury, and please proceed with the deposition.

(AT THIS TIME PLAINTIFF'S TRIAL EXHIBIT NO. 1 WAS RECEIVED IN EVIDENCE AND WAS MADE A PART OF THIS RECORD.)

Answer: And the shininess of the skin around the nose and around the mouth that are visible in the photograph, the discoloration of skin on the right forearm that is visible, and the portion of the left forearm and upper arm that are visible in the photograph, and the distribution of the enshar and erythema on the right knee, the left thigh, and left ankle are reasonable representations of how I remember seeing Mr. Boyer that evening. Question: Do the locations on that photograph correspond with the charted locations on your medical records, Doctor? Answer: Yes, they do.

Although errors, like the one presented here, could be avoided if a witness is specifically required to testify that the photograph is a fair and accurate portrayal of the subject matter purported to show, a trial court may discern from the language employed and the reasonable inferences therefrom that photograph represents the view as the witness saw it. *Rust and Martin, Inc. v. Ashby*, 671 S.W.2d 4, 8 (Mo.App.1984). The language used by Dr. Bradley, that "the person in this photograph has facial characteristics that make me think is indeed Ralph Boyer," creates a strained interpretation to justify authentication; *see Id.; State v. Daugherty*, 631 S.W.2d 637, 641 (Mo.1982); *State ex rel. State Highway Commission v. Cone*, 338 S.W.2d 22, 27 (Mo.1960); however, Dr. Bradley's testimony *after* the introduction of the exhibit refutes defendants allegation there has been an abuse of trial court discretion by its introduction. Thus, the trial court's ruling shall not be disturbed. *Rust and Martin, Inc. v. Ashley, supra*, 671 S.W.2d at 8.

■ Defendants also state plaintiff failed to establish basic fundamental facts regarding the chain of custody of the tattered clothing allegedly worn by plaintiff at the time of the explosion. Plaintiff testified:

Q. Mr. Boyer, I'll hand you what' marked now as plaintiff's Exhibit 47; what is it?

A. That's the clothes that I was wearing at the time of the accident, or what's left of them.

Q. Sir, how did they get into your custody?

A. Well, they were given to me out at the hospital.

Q. Which hospital?

A. Chillicothe—Hedrick Medical Center.

Q. And have you done anything to them from the time they came into your custody from Hedrick Medical Center?

A. No, sir, I haven't. They were shown to me and put in a bag, and it's just like it was when I received it.

Q. Have you ever opened the bag since you've see them?

A. I have never opened the bag. No, sir.

Q. Would you open it at this time, please? Okay. Would you take out one of the articles there and tell us what it is?

A. That was my shorts.

Q. Your what, underwear?

A. Yes.

Q. All right. What else?

A. This was the shirt I had on at the time.

Q. Was that a long or short-sleeved shirt when you went down into the basement?

A. It's a short-sleeved shirt.

Further testimony revealed the bag had been stored in the trunk of his car parked outside his house for six years. He admitted the bag contained signs of "a little must." There was no testimony concerning the chain of custody prior to plaintiff's receipt of the clothing; Dan Wigfield, an EMT from the ambulance crew who picked up plaintiff, did testify plaintiff's clothes were cut off at the hospital and that it is a normal procedure to cut the clothes from a burn victim. Dr. Bradley testified the burn patterns on plaintiff's clothing were consistent with similar patterning he has observed in other cases of burns.

A flawless chain of custody is not required. *Storm v. Ford Motor Company,* 526 S.W.2d 875, 878 (Mo.App.1975). In *Stallman v. Robinson,* 364 Mo. 275, 260 S.W.2d 743, 749–750 (1953), plaintiff's wife committed suicide at the defendant's hospital by using strips of cloth torn from her nightgowns. Four hospital gowns, two pink and two yellow, were admitted into evidence over the defendant's objection that there were only two gowns, the yellow ones. The plaintiff did not remember who gave him the gowns at the hospital but that he put them in a suitcase at the hospital and they remained in his possession until the time of trial. Hospital identification tags were fastened to the gowns. The reviewing court found the trial court did not prejudicially err in admitting them into evidence. *Id.* 260 S.W.2d at 749–750.

Here, plaintiff testified the clothes were in the same bag that was given to him at the hospital. The chain of custody contains no more imperfections than the one as seen in *Stallman v. Robinson, supra,* and the court did not abuse its discretion by its admittance.

V.

It is unnecessary to address other allegations of error in view of this court's decision that the verdict directing instruction as to Empire, Inc. is prejudicial and erroneous. The judgment is reversed and the cause is remanded as to the liability of defendant Empire, Inc. Directions are given to the trial court to hold in abeyance the verdict as to both liability and amount of damages against defendant Empiregas until the cause is disposed of as to the liability of defendant, Empire, Inc., and punitive damages, if any. The trial court will then re-enter judgment for the amount of the verdict held in abeyance against all defendants finally held liable and punitive damages, *Hoelzel v. Chicago R.I. & P. Ry. Co.,* 337 Mo. 61, 85 S.W.2d 126, 133–4 (1935), *McGraw v. Montgomery,* 239 Mo. 239, 185 S.W.2d 309, 320 (Mo.App.1944); *Lerner v. Yeghishian,* 271 S.W.2d 588, 593 (Mo.App. 1954).

All concur.